NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1006n.06

Nos. 09-5181, 09-5189, 09-5190, 09-5191, 11-5453, 11-5454, 11-5455

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | *Sep 11, 2012* |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| RANDALL CLINTON THOMPSON | ) | |
| (09-5181, 11-5453), | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| JOHN MAC COMBS | ) | District of Kentucky |
| (09-5189, 11-5455), | ) | |
| | ) | |
| RONNIE ADAMS | ) | |
| (09-5191, 11-5454), | ) | |
| | ) | |
| PHILLIP G. CHAMPION | ) | |
| (09-5190), | ) | |
| | ) | |
| Defendants-Appellants, | ) | |

Before:     BOGGS and MCKEAGUE, Circuit Judges; and WATSON, District Judge.[*]

BOGGS, Circuit Judge.  This consolidated appeal arises out of a jury trial for conspiracy, misappropriation of county funds, and vote buying in Knott County, Kentucky, a county with a history of political and electoral corruption.  Randall Thompson and his three co-defendants, John Mac Combs, Philip G. Champion, and Ronnie Adams, were all convicted for aiding and abetting one

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

another in intentionally misappropriating public funds in excess of $5,000. Adams was also convicted of one count of offering to compensate a voter with services in exchange for voting for Thompson.

The four defendants all appeal their convictions; Combs and Champion also appeal their sentences. All four defendants appeal the denial of a motion for new trial based on *Brady* violations. We affirm the district court with regard to all the defendants' claims.

I

A

Randall Thompson was appointed Knott County Judge/Executive[1] in October 2005, following the conviction of the preceding judge executive, Donnie Newsome, for vote buying and conspiracy. During 2006, Thompson ran to keep his position in a "hotly contested" race. Although over 90% of Knott County voters were registered Democrats, Thompson, a Republican, won a new term in November 2006 by a margin of 64 votes. Once elected, Thompson's administration employed Combs and Champion as Knott County deputy judge/executives. Adams was an elected magistrate on the Knott County Fiscal Court. The case concerns the actions of Thompson, Combs,

---

[1] In Kentucky, a "county judge/executive" functions as the chief executive officer of the county, "responsible for the proper administration of the affairs of the county placed in his charge." KY. REV. STAT. (K.R.S.) §§ 67.705–10. He has the power to appoint a deputy executive and various other assistants as he sees fit, "who shall serve at his pleasure." *Id.* § 67.711(1). He also serves as the presiding officer on the county's fiscal court, the financial governing body of the county. *Id.* §§ 67.040, 67.080.

Champion, and Adams, from July 2006 through November 2006, the months preceding the election. R.3 at 4.

In 2006, the Knott County Fiscal Court allocated a $1,500,000 road bond issue, $500,000 in county surplus money, and $375,000 in Kentucky transportation funds for blacktopping. Bryan Jacobs, a CPA and the Knott County treasurer, testified during trial that this was a large amount to spend on blacktop. ("Q. Was that an unusually high amount of blacktop expenditure for Knott County at that time? A. Yes, that's a lot of blacktop, yes."). Decisions on how to spend the money were made by the fiscal court and the judge/executive. Subsequently, Adams arranged a meeting where a small blacktop company owner, Randy Campbell, met with all of the defendants at Thompson's office. They hired Campbell and one of the defendants told him that Combs would show him where to pave.

Combs directed Campbell to pave multiple private driveways throughout the county over a two-and-a-half-month period. ("Q: Did you lay blacktop on private property? A: Yes. Q: And who directed you to do that? A: Mac Combs."). Combs directed Campbell to pave both public and private drives, including Combs's own driveway, the driveway of Thompson's secretary, Tammy Brewer, and her father, Hoey Dobson.[2] Campbell testified that he also laid blacktop on public roads at Combs's direction. Adams also directed some of the free paving.

---

[2]It is unclear if this paving took place before the election; Campbell testified that he believed that he paved Brewer's and Dobson's driveways in December 2006. ("Q. And do you recall when that occurred? A. It was in, I think, December. I'm not sure what date.").

The defendants also put gravel on private property for free. Campbell testified that, in the summer and fall of 2006, Phillip Champion directed him to put down gravel on private property, and Mac Combs rode with him to show him where to put it. One contractor testified that Combs told him that Judge Thompson had told Combs to ride with the contractor to show him where to put the gravel.

In addition to laying blacktop and gravel on private drives without charge, trial testimony showed that the defendants also tried to cover up the free blacktop by issuing false receipts. Combs asked Campbell to prepare receipts reflecting a cash payment to "put them in the clerk's office just in case." Campbell acquiesced, providing fake receipts to Combs, Brewer, and Dobson.[3]

The defendants, in addition to free blacktop and gravel, repaired or built bridges on private property before the election. Randy Gayheart, a Knott County worker who specialized in bridge building, testified that during the summer and fall of 2006, the time leading up to the judge race, he built "around 20 bridges, including 'several' on private property." He testified that he was instructed to build the bridges by Phillip Champion and Randy Thompson. Gayheart worked both on his own time and on county time building the bridges before the election. Gayheart estimated his fee for one bridge as $3,000, and that a bridge, including the materials needed to build it, cost about $4,500 or $5,000. The county bought the materials and paid Gayheart for building the bridges, on top of his

---

[3] Brewer later provided the receipt to federal agents and testified, falsely, before a grand jury that she and Dobson had paid cash for the paving. Dobson also testified falsely before a grand jury that he had paid cash for the work and received the receipt from Campbell or one of his workers. Both Brewer and Dobson were convicted of perjury, and their convictions were affirmed by this court. *United States v. Brewer*, 332 F. App'x 296 (6th Cir. 2009).

normal county salary. He verified during trial that many of the bridges were on private property and provided access only to single houses.

Adams also specifically spoke about trading blacktopping services for Thompson votes. Knott County resident, Brandon Moore, testified that Adams offered to blacktop his driveway in exchange for a vote cast for Thompson. ("I pulled up, and he asked me I'd like to have my hill blacktopped, and I said, 'Yeah,' I said, but I couldn't afford it, and he said it wouldn't cost me nothing but a vote."). Moore agreed to vote for Thompson; his drive was paved shortly thereafter. *Id.* at 51. The drive was on private land and only provided access to one home. *Id.* at 53. However, Moore was not firm on the fact that it was Adams who offered the service. *Id.* at 50 ("I'm pretty sure he said his name was Ronnie Adams. I think's what it was."). Moore claimed that he had never met Adams, but came to know who he was "[j]ust through people talking." *Ibid.* Moore also failed to identify a picture of Ronnie Adams as the man that offered to pave his driveway, but later identified another picture and explained the confusion. *Id.* at 51 ("He looked different, had glasses on and stuff in the second picture.").

Another Knott County resident, Bobby Reynolds, recalled the following phone conversation with Adams:

> Then [Adams] just asked me what did I think about the election, and I told him I hadn't really thought about it. I asked what he was doing, and he said he's down blacktopping a lot. He was for Randy Thompson, and I told him, I said, ["]Well, why don't you bring some blacktop around here . . .[,"] and he said, "I'll try to before the election. If I can't, I'll get it after the election." I said, "Well, if you can do it before"—he asked me how everybody'd vote up here—he asked me how's all my family going to vote, and I told him I hadn't asked them, and he said, "Well, if I can

> get it to you . . . to blacktop you before the election,["] and I said, "Well, if you blacktop before the election, every one of them in here will vote for Randy."

Reynolds and roughly thirty of his family members live on Rooster Lane.[3] The road was paved two weeks before the November election.

Campbell billed the city for the driveways that he was directed to pave. However, the invoices from Campbell and the other companies hired for similar contract work listed the tonnage of asphalt used but not the location of the work performed. R.210 at 118–19, 231–32; R.214 at 60. Furthermore, the record is clear that many homeowners who received paving on their private property in 2006 did not pay for the service.

Thompson appointed Champion a deputy judge in early 2006 and charged him with oversight of the county road department. Harold Bentley, then road foreman, testified that Champion "more or less ran the show," making decisions about daily assignments and projects. ("[I]f there was something that he wanted done, you know, [Champion] would come and tell me, you know, what to do."). Paul Slone, a Knott County grader operator, testified that Champion told him which driveways to grade before the contractors blacktopped them. Slone also testified that Combs rode with him the Saturday before the election, telling him where to lay gravel. Tom Hays, a Knott

---

[3] Defendants presented evidence that Rooster Lane was maintained as a public road prior to the Thompson administration. A former Knott County road foreman testified that the county maintained the road by "work[ing] on it several times" in the wake of heavy area flooding. However, Reynolds testified that only part of the road had been previously paved and that the portion paved immediately before the 2006 election was a private road.

County truck driver, testified that Champion directed him to place gravel on driveways prior to the election, and Combs rode with him.

During the 2006 race, Randy Walters, a news reporter covering the race, attended several Knott County fiscal court meetings. At a meeting in September 2006, he asked Judge Thompson about the county paving bridges to private residences. Thompson merely answered that "they were saving money by having county employees build the bridges." At the September and October meeting, Walters also asked whether the county was paying to blacktop private driveways, and Thompson denied it.

Byron Jacobs, who has been the Knott County treasurer since 2005, became concerned in 2006 when he heard Walters's accusations in fiscal-court meetings that bridges and blacktop were being provided to private individuals for private purposes. Jacobs wrote two letters seeking verification that specific graveling, road work, and bridge repairs, including those of Randall Gayheart, were "performed for a public purpose." Thompson replied in writing to both letters, stating that the projects had been "properly inspected" and "all of the projects meet the requirement of being performed for a public purpose."

Ralph Dyer, a county road worker, contacted the Kentucky Attorney General's office and a local television reporter to inform them that Thompson's administration was using public funds on private property. Dyer, who was laid off in March of 2007, believed he had been laid off for letting people know about his suspicions.

In a 2007 interview with the news reporter, Thompson stated, "I paved a lot of roads and we built a lot of bridges and that's because people's [sic] our tax payers." She asked, "So they deserve

that?"  Thompson responded, "Yeah.  Absolutely."  Addressing whether the work was on private

property, Thompson said: "I guess it depends on who you ask whether it's private.  I've learned since

being in this office that if I'm working for you, it's county but if I'm working for your neighbor, it's

private.  And it seems like people with political agendas . . . ah, bring up those arguments."

Kentucky counties are audited annually by the Office of the Auditor of Public Accounts.  In

2006 , Simon, Underwood & Associates received the bid for the 2006 and 2007 year-end audits for

Knott County.

During the year-end 2006 audit, which covered July 5, 2005 to June 30, 2006, the auditors

noted that road expenditures had increased by 583% between July 1, 2006 until January, 2007.  *Id.*

at 118.  The auditors were unable to verify the public use of $780,000 out of the roughly $1,500,000

paid to contractors for road work during that time.  Material information was missing—either

location of the work, date of its completion, or the amount of the materials used.  ("Usually there was

not a road indicated on the vendor invoice.").  The auditors also noticed that instead of the usual one

vendor providing road services, during this period (and not after) the county employed four.  At trial,

the government questioned the auditor concerning the insufficiency of these documents:

> Q. What is the problem with the way the three temporary blacktoppers were
> invoicing it?  What were you not able to do?
>
> A. We were not able to trace the information, one, to make sure that it was
> used—public funds were used for public roadways, or for a public project. We could
> not verify that. And within the county's administrative code for the road department,
> it specifically instructs the county that they cannot use public funds for private roads.

Furthermore, the auditors found that the county had paid $69,411 to a county road worker above his salary for constructing twenty-three bridges. Similarly, this could not be verified as a public expenditure because the worker's invoices did not list specific projects.

The auditors complained to the Kentucky State police about their findings in December 2006, which led to an investigation by the task force devoted to public corruption.

B

On November 29, 2007, a federal grand jury returned an indictment on the four defendants.

The indictment charged Thompson, Champion, Combs, and Adams with one count of conspiring to pay individuals for voting in an election held in part to elect a United States representative, in violation of 42 U.S.C. § 1973i(c), and intentionally misapplying government property, valued at more than $5,000, of a local government that received federal funds, in violation of 18 U.S.C. § 666 ("Count One").[4] The indictment also charged all four defendants with aiding and abetting one another to intentionally misapply such government property, in violation of 18 U.S.C. §§ 666 and 2 ("Count Two").

The indictment also charged Ronnie Adams with one count each of offering to pay and paying voter "B.R." to vote for Thompson in exchange for the county paving his private road, ("Count Three"), and offering to pay and paying voter "B.M." to vote for Thompson in exchange for

---

[4]Knott County receives federal funds directly from the USDA, from FEMA, and indirectly from the Kentucky River Area Development District and the Commonwealth of Kentucky Transportation Cabinet.

the county paving his private road, ("Count Four"), both in violation of 42 U.S.C. 1973i(c). The

defendants all pleaded not guilty.

In June 2008, the district court held a 10-day jury trial. During trial, the defendants made

certain objections that are relevant to this appeal.

First, defendants objected to the government's introduction of the grand-jury testimony of

Tammy Brewer and Hoey Dobson. The court addressed the defendants' objections the following

day, with this statement:

> The Government has argued that the significance of the statements that had been offered into evidence is that not [sic] that they were true, but that they were false. In fact, they were offered for that particular purpose. Those statements are establishing the foundation, in essence, for later showing the fact that they were false because of the conviction of the individuals who made the statements for perjury. . . . [T]here's some [C]onfrontation [C]lause objections that always comes up in the context of allegations that a particular statement is hearsay.
> But . . . [t]hese are not hearsay statements. . . . [T]he Sixth Circuit concludes . . . that . . . when statements are offered to prove the falsity of the matter asserted, there's no need to assess the credibility of the declarant [citing *United States v. Hathaway*, 798 F.2d 902, 904–905 (6th Cir. 1986)].

The government responded to the defendants' objections regarding the Brewer testimony, also,

stating:

> I think some of [defendants'] concerns about the—what was on that Brewer grand jury tape were well taken, and had there been objections before I played it, I would have agreed to redact some of that. So being sensitive to that, I have redacted the Hoey Dobson grand jury to its bare essentials to what we need to make our point . . . .

During his closing argument, the government again referred to Brewer's and Dobson's grand-jury

testimony, focusing on the fact that they made up a "fake alibi," and this proved that she was a part

of a cover-up.

Second, the defendants objected to the court's admission of a television interview a local news station conducted with Thompson. The interview was, according to defendants, thirty minutes long before the news station edited it. Though the government played the broadcasted clip in its entirety, the defendants argued that under the "rule of completeness" the government should have to admit the full, thirty-minute-long interview. The judge overruled the objection.

Third, defendants objected to a question posed by the prosecutor to Eldon Hicks, Knott County's jailer, during Hicks's cross-examination. The prosecutor asked Hicks a series of questions relating to the administration of Donnie Newsome, Thompson's predecessor as Knott County Judge/Executive, who had been convicted of vote buying, seeming to attempt to get Hicks to state that Newsome's administration had induced voters to vote for him by giving away free blacktop. When Hicks stated that he had not been privy to Newsome's actions when Newsome was elected, the Prosecutor asked, "Was Donnie Newsome convicted of vote buying?" Thompson and Adams objected that the prosecutor was attempting to inject "fairly extreme prejudice" into the proceedings. After a bench conference with both sides and the agreement of all parties, the court admonished the jury that Newsome's conviction "did not include as a factual basis . . . the building of bridges or the paving of roads."

The jury found all four defendants guilty of Count Two, aiding and abetting each other to misapply government property, in violation of 18 U.S.C. § 666. Thompson, Combs, and Adams were also convicted of Count One, conspiracy to misapply property and to buy votes, in violation of 18 U.S.C. § 371. Adams was also convicted of Count Three, vote buying, in violation of 42 U.S.C. § 1973i(c), but not Count Four.

*Post-Trial Motions*

In July 2008, prior to sentencing, Champion filed a motion for acquittal based on insufficient evidence. The same day, Combs filed motions for acquittal and a new trial. Four days later, Thompson and Adams filed a motion to join these motions.

In addition to arguing that there had been insufficient evidence to support their convictions, defendants also argued in their motions that they deserved a new trial because the prosecutor engaged in flagrant misconduct during his closing argument, a portion of a television interview with Thomson was improperly admitted, and prior grand-jury testimony of Tammy Brewer and Hoey Dobson was improperly admitted. R.237 at 9, 12, 14.

On February 9, 2009, the district court denied the motions in four separate orders. The court determined that, drawing all inferences in favor of the government, sufficient evidence existed to convict each of the defendants. The court stated that though there was "no evidence that Thompson specifically directed anyone to gravel or blacktop a particular driveway or road," Gayheart had testified that Thompson and Champion directed him to build bridges on private property, and Randy Campbell, the owner of East Kentucky Paving, was hired by Thompson and Adams. Witnesses testified that Combs and Adams rode with them in their trucks and directed them where to put gravel and pave. Campbell testified that Combs had asked him to prepare fake receipts to make it appear that private citizens had paid for the services. Adams offered to pave Bobby Reynolds's private drive in return for the Reynolds family voting for Thompson. The court determined that the jury had

sufficient evidence to find that, as the ultimate beneficiary of political goodwill, Champion's, Combs's, and Adams's actions were undertaken with the approval or direction of Thompson. Moreover, when Thompson was put on notice of the suspicious activity by reporters, the court noted that Thompson stated that all the jobs were for a public purpose and had been properly inspected, indicating that he was covering up the expenditures.

Regarding the prosecutor's remarks, the court noted that, as the defendants did not object to the prosecutor's remarks at trial, the defendants were only entitled to a new trial if the remarks "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16 (1985).

The court determined that the prosecutor's complained-of comment that he hoped the jury would do its "duty," "while improper, [did] not rise to the level of being flagrant." The court determined that the complained-of remarks were isolated, not made to inflame the jury, and that similar remarks had been held acceptable in prior cases. *See United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991) ("Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible.").

Regarding the television interview with Thompson, the court determined that the evidence was properly admitted. The court first determined that the television interview was properly admitted because the government played the clip in its entirety. Thompson argued that the unedited interview was thirty minutes long, and that the rule of completeness, FED. R. EVID. 106, demanded that, upon Thompson's objection the entire thirty-minute interview should be admitted. However, the government was only in possession of the edited clip of the interview that was actually broadcast.

Because the government admitted and played this clip in its entirety, the court determined that Rule 106 had not been violated.

Regarding the prior grand-jury testimony of Tammy Brewer and Hoey Dobson, the district court also held that the evidence was properly admitted. The defendants objected at trial and in their motion that the testimony violated the Confrontation Clause because the testimony constituted out-of-court statements, offered to prove the truth of the matter asserted, and defendants had not had the prior opportunity to cross-examine the declarants. FED. R. EVID. § 801(c); *United States v. Crawford*, 541 U.S. 36, 53–54 (2004). The district court disagreed with the defendants that the testimony was offered to prove the truth of the matter asserted. In fact, the court stated, the testimony was acknowledged as being false, and had indeed led to Brewer and Dobson being convicted of perjury. The court noted that these kinds of statements are admissible under *Crawford*. *See Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes *other than* establishing the truth of the matter asserted.")).

*Sentencing*

The four defendants were sentenced on February 2, 2009. Each of the defendants made numerous objections to his particular pre-sentence report. The district court resolved all of the objections to the pre-sentence reports at trial. Those objections relevant to the case on appeal are discussed in turn.

One major objection raised by all four defendants was to the pre-sentence reports' determination of loss. The amount of loss was particularly important for two reasons: it affected the

amount of mandatory restitution,[5] and it affected the guidelines calculations for each defendant.[6] The probation officer calculated the amount of loss as the $780,814 in road expenditures that the auditors could not validate, in addition to the $76,711 paid to county employees as independent contractors for the construction of bridges without valid invoices. Thus, the total amount of loss was calculated as $857,525.

The defendants all objected to this loss amount, arguing that the government had not proved that $857,525 had been spent on private property. Defendants objected specifically to Lonesome Dove Road ($14,000), which they argued had been publicly maintained before the Thompson administration. The defendants argued that, in fact, the government had only proved that $7,873.50 of the total unaccounted-for amount had been proved to have been spent on private property and bridges.

At sentencing, the court heard arguments from all defendants and the government as to the amount of loss. The court noted that to prove guilt at trial, the government only needed to prove misapplication of public funds of more than $5,000. The court noted, however, that the pool of unaccounted-for funds was much larger, and the court could consider that amount at sentencing. The court stated that it was not required to determine the amount of loss with mathematical certainty, but

---

[5]Restitution was mandated by 18 U.S.C. § 3663A(c)(1)(B), which states that for "any offense . . . in which an identifiable victim or victims has suffered . . . pecuniary loss," the court "shall order, in addition to, . . . any other penalty authorized by law, that the defendant make restitution to the victim."

[6]The pre-sentence report's calculation of loss as $857,525 resulted in a 14-level increase in the offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

only to make a reasonable estimate. The court stated, in its discussion of loss related to paving and blacktopping, that it was "not inclined to limit [consideration] just to what was presented at trial. [T]here's a loss here that is greater than that, but is somewhat less than the $780,000, which is the pool of possible loss [for paving and blacktopping]." The court noted that because there was no documentation, it was impossible to know how much had been spent on private property.

The defendants reiterated the arguments made in their objections to the pre-sentence reports' loss calculations, continuing to argue that the government had only carried its burden of proving by a preponderance of the evidence about $7,000 in loss. Additionally, Phillip Champion's lawyer argued at sentencing that, because he was not convicted of the conspiracy charge (Count One), Champion should not be held jointly and severally liable with the other defendants for the loss.

The government, in its statement, described the context surrounding the offenses. First, it stated, Thompson's administration took out bonds in the amount of $1.5 million for roads. Mountain Enterprises, the county's long-time contractor, worked for the county after this money was received. However, Mountain Enterprises stopped working for the county "because they didn't like what was . . . happening about where they were being told where to put the blacktop." After Mountain Enterprises pulled out, the $780,000 that was unaccounted for was spent on "little choppy jobs, up to cemeteries, to people's houses, places that hadn't been blacktopped before." The jobs were not documented, but "the defendants should not get a windfall by virtue of an intentional act of not documenting." The government stated that it believed that some of the money was spent on public roads, but that at least a quarter of the $780,000 was spent on private roads.

Regarding the bridges, the government noted that Gayheart had testified as to around 20 bridges. Of these, it was again unclear, due to a lack of documentation, how many were built on private property. The government was not exact, but seemed to argue that about ten of the bridges should be considered to have been on private property. In total, the government argued that the defendants should be put in the U.S.S.G. 2B1.1 loss category of $200,000–$400,000, and that restitution should be ordered for "the lower end of that $200,000."

The court, after considering all arguments with regard to loss, decided that a reasonable estimate for the amount of loss attributable to the paving and blacktopping of private roads was 25% of the over $780,000 unaccounted for, or $195,203.50. This calculation was in accord with the government's recommendation.

The court then determined that the evidence at trial indicated that at least five or six of the bridges constructed were shown to have been private. It decided that it would use five bridges for its loss determination. Evidence at trial showed that the bridges cost somewhere from $3,000 to $4,500 to construct. The court used $3,700 as its cost for a bridge, making the total bridge loss $18,500.

The court also added other expenses. Evidence had shown that a county foreman was paid to build bridges after hours, and that he had been paid $69,411 on top of his county salary. The court determined that $15,089 of this amount should be considered to have been paid for work on private property, and added to the total loss. For gravel, the court estimated that $10,000 should be added to the total loss. Adding all of these figures together—$195,204, $18,500, $15,089, and $10,000—the total loss determined by the court was $238,793.

- 17 -

After the amount of loss was determined, the court recalculated the offense level for each defendant. The court noted, in its discussion of the factors in 18 U.S.C. § 3553(a), that it saw a need for the sentences to reflect the seriousness of the offense, due to the pervasiveness of political corruption in the area and the need for a "cultural change." The court, however, did not feel, for any of the defendants, that recidivism was a concern, or that rehabilitation was necessary. The court noted that the misappropriation of funds in this case went to benefit county constituents, not the defendants themselves. The court also stated that the defendants had all served their community well despite their offenses. The court stated that this was one of the rare cases where the time the defendants were imprisoned would be time that they would not be benefitting their community. Based on these considerations, the court chose to depart from the sentencing guidelines for each defendant.

Thompson's recalculated offense level was 25, which gave him a guidelines range of 57 to 71 months of imprisonment. The court departed from the guidelines and sentenced Thompson to 40 months of imprisonment for each of Counts One and Two, to run concurrently. Thompson was also sentenced to three years of supervised release, and was held jointly and severally liable with the other three defendants to pay mandatory restitution of $238,793.

Combs's recalculated offense level was 26, with a guidelines range of 63 to 78 months of imprisonment. The court departed from the guidelines and sentenced Combs to 36 months of imprisonment for each of Counts One and Two, to run concurrently. Combs was also sentenced to three years of supervised release, and was held jointly and severally liable with the other three defendants to pay mandatory restitution of $238,793.

Champion's recalculated offense level was 23, with a guidelines range of 46 to 57 months of imprisonment. The court departed from the guidelines and sentenced Champion to 18 months of imprisonment for Count Two. Champion was also sentenced to three years of supervised release, and was held jointly and severally liable with the other three defendants to pay mandatory restitution of $238,793.

Adams's recalculated guidelines range was 24, with a guidelines range of 51 to 63 months of imprisonment. The court departed from the guidelines and sentenced Thompson to 32 months of imprisonment for each of Counts One, Two, and Three, to run concurrently. Adams was also sentenced to three years of supervised release, and was held jointly and severally liable with the other three defendants to pay mandatory restitution of $238,793.

*Post-Sentencing Motions*

On August 25, 2009, all four defendants joined in a motion for a new trial based on *Brady* and *Giglio* violations. The defendants alleged that the prosecution failed to appropriately disclose grants of immunity to twenty witnesses. The United States responded, additional discovery was taken, and the district court held an evidentiary hearing on the motion on February 22, 2010.

On April 4, 2011, the district court issued an opinion denying the defendants' motion. The court stated that to make out a *Brady/Giglio* violation, the defendants had to show three elements: "[1] the evidence must be favorable to the accused, either because it is exculpatory, or because is impeaching; [2] that evidence must have been suppressed by the state, either willfully or inadvertently; and [3] prejudice must have ensued." A defendant is prejudiced, the court noted,

when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995).

At issue were the United States's promises not to prosecute a number of its witnesses if they provided honest testimony. The court began its analysis by stating that such grants of immunity were impeaching, and thus favorable toward the defendants. Thus, the defendants had made out the first element of a *Brady* claim.

However, the court began to diverge from defendants on the second element—that the government suppressed the evidence. The court found that the witnesses fell into three categories: those for whom the government timely provided evidence of immunity, those for whom the government provided delayed or tardy evidence of immunity, and those for whom no evidence of immunity was provided.

First, the government had provided defendants with the grand-jury testimony of ten witnesses eight days before trial. This grand-jury testimony contained the government's promise of immunity to these defendants. Defendants conceded that they had received these transcripts. For these transcripts, the court determined that the government had complied with its obligations under *Brady*.

Second, the court found that the government had given the defendants the grand-jury testimony of an additional eight witnesses during trial, either the night before or the morning of the witness's testimony. The defendants conceded that they received the transcripts and that they showed the government's grants of immunity. However, the defendants argued that the transcripts were given to them too late to be of use. The court disagreed. It noted that "[a]ny disadvantage that a defendant might suffer because of the tardiness of impeachment material can be cured by asking

for a recess," and that the defendants never requested such a recess. *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004).

The court also determined that the defendants' trial strategy showed that they had not been prejudiced by the delayed receipt of the transcripts. The court described the defendants' strategy as attempting to prove that the roads in question were public, and therefore properly paved by the county. Showing that the government had granted the witnesses immunity, and therefore implying that their acceptance of free road paving was potentially criminal—would have undermined that strategy. The court observed, for example, that the defendants chose not to impeach any of the witnesses for which they knew about the immunity guarantees.

Third, the court determined that there was a category of eight witnesses for whom the promises of immunity were not disclosed to the defendants at any time. However, the court found that the defendants failed to meet their burden of proving that these witnesses received promises of immunity. The defendants did not provide evidence suggesting that the witnesses received immunity and failed to rebut the government's argument that they did not provide immunity to those witnesses. The court noted that the evidentiary hearing on the motion gave the defendants ample time to develop the record, but they failed to do so.

Finally, the court considered all of the evidence collectively to see if it rose to the level of prejudicing the defendants. The court noted that each piece of evidence was identical, so that the difficulty in impeaching the witness was essentially the same for each witness. Further, the court noted that this case was based on the corroborating evidence of many witnesses, rather than hinging on the testimony of one witness who it would have been extremely important to impeach. Finally,

the court noted again that the defendants chose not to impeach the witnesses who they knew had been promised immunity. Based on these reasons, the court determined that the evidence, viewed collectively, did not prove that the defendants had been prejudiced.

Based on these reasons, the court held that the defendants had failed to prove a *Brady/Giglio* violation, and denied the motion for a new trial.

All four defendants appeal the sufficiency of the evidence that led to their convictions. They also all appeal the district court's decision not to grant a new trial based on the prosecution's alleged *Brady* violations. Champion and Combs argue that certain evidence was improperly admitted or excluded at trial. Combs argues that the application of the statute against misappropriating funds was unconstitutionally applied. Thompson and Adams argued that the prosecutor's question about Donnie Newsome and the prosecutor's closing argument violated their due-process rights. Finally, Champion and Combs appeal their sentences.

II

A

We review the sufficiency of the evidence to support the defendants' convictions first, "because it is determinative of whether the appellant may be retried." *United States v. Parkes*, 668 F.3d 295, 300 (6th Cir. 2012) (quoting *United States v. Aarons*, 718 F.2d 188, 189 n.1 (6th Cir. 1983)) (internal quotation marks omitted). The "critical inquiry on reviewing the sufficiency of evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). This is a heavy burden. We begin by determining the essential elements of the relevant offenses—those embodied in Counts One, Two, and Three—and then examine the evidence supporting those elements.

Count One stated that the defendants conspired to pay individuals for voting in an election held in part to elect a United States representative, in violation of 42 U.S.C. § 1973i(c), and intentionally misapplied government property, valued at more than $5,000, of a local government that received federal funds, in violation of 18 U.S.C. § 666.

To prove a violation of conspiracy, the government bore the burden of showing "an agreement to commit an unlawful act." *United States v. Jiminez Recio*, 537 U.S. 270, 274 (2003). Participation in a conspiracy need not be proven by direct evidence. *United States v. Collins*, 78 F.3d 1021, 1038 (6th Cir. 1996). A "tacit or mutual understanding to engage in a common plan is sufficient" to prove a conspiracy. *Id.* at 1037. The government was required to prove that Thompson agreed with the other defendants to commit the underlying offense—either vote buying or the intentional misapplication of funds.

In order to prove the first potential underlying offense, under 42 U.S.C. § 1973i(c), the government was required to prove that Thompson participated in a conspiracy to pay an individual to vote.

In order to prove the second potential underlying offense, under 18 U.S.C. § 666, the government bore the burden of demonstrating that: "(1) the defendant is an agent of an organization, State, local or tribal government, or an agency of such government; (2) the defendant embezzles,

steals, obtains by fraud, or otherwise without authority knowingly converts to the use *of any person other than the rightful owner* or intentionally misapplies, property that—(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; and (3) such organization, government, or agency receives at least $10,000 in federal assistance in any one-year period." *United States v. Freeman*, 86 F. App'x 35, 38–39 (6th Cir. 2003) (emphasis added) (citing 18 U.S.C. § 666(a)(1)(A), (b)).

Thompson argues that the government produced no evidence that he joined a conspiracy to exchange blacktop and bridges for votes or that he intentionally misapplied Knott County property. Thompson's primary argument seems to be that the government did not give direct proof of his involvement in a conspiracy.

It is true that the government did not provide direct evidence that Thompson was engaged in the conspiracy. However, the government provided ample circumstantial evidence to support a conviction. Some of the more powerful pieces of evidence were (1) that Thompson hired Randy Campbell's paving company, East Kentucky Paving, (2) that Campbell was then directed by Thompson's employees to pave private roads, (3) that Thompson's employees asked Campbell to create false receipts for the paving, (4) that Thompson told reporters that each of the jobs performed was done for a public purpose and had been properly inspected, and (5) that this activity was engaged in during the months leading up to Thompson's re-election. Additionally, Randall Gayheart testified that he built bridges on private property as directed by Thompson and Champion.

Viewing the evidence in the light most favorable to the government, a rational trier of fact could find beyond a reasonable doubt that Thompson agreed, if even tacitly, to misapply public funds and/or to buy at least one vote. Thompson's insufficiency claim must fail.

Like Thompson, Combs argues that the government failed to prove that he was a member of a conspiracy—Combs argues that the evidence presented was not merely circumstantial, but required a "leap of faith in order to support a conviction." Combs Brief at 33 (quoting *United States v. White*, 932 F.2d 588, 590 (6th Cir. 1991)) (internal quotation marks omitted).

We disagree. The government not only presented evidence that Combs was present at the meeting where Campbell was hired, but he was named as the individual who directed Campbell's paving, as well as the paving done by other drivers. Testimony revealed that Combs directed Campbell to pave Combs's driveway, as well as Tammy Brewer's and Hoey Dobson's, who were later convicted of perjury for testifying that they paid. Finally, Combs was the individual who asked Campbell to prepare false receipts for the paving.

Combs argues that these acts were merely acts done in his "line of work," and that they are insufficient to support a conspiracy conviction. This objection is unavailing. It is clear from the record that the government presented sufficient evidence for a rational trier of fact to convict Combs of being a member of a conspiracy to misapply public property. Combs's sufficiency argument must fail.

Adams likewise fails in his argument that the government failed to prove that he was part of the conspiracy to buy votes or misapply public property. However, Adams arranged and attended the meeting in which Campbell was hired. Testimony showed not only that he directed paving of

private property, but that he offered paving in exchange for votes for Thompson. Adams's sufficiency argument is without merit.

Unlike the other three defendants, Phillip Champion was not convicted of Count One of the indictment. Champion was not convicted of conspiracy, but rather only of the misapplication of public funds. Specifically, the count charged the defendant with "aiding and abetting." Conspiracy differs from aiding and abetting because conspiracy involves an agreement to participate in a wrongful activity, while aiding and abetting can be accomplished if the defendant "knowingly gave substantial assistance to someone who performed wrongful conduct," even if the defendant did not necessarily agree to join in the conduct. *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) (internal quotation marks omitted) (quoting *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983)) (explaining the difference between conspiracy and aiding and abetting in the civil context). Therefore, the government was required to prove that Champion at the very least provided "substantial assistance" to one who misapplied public funds.

Viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the evidence sufficient to convict Champion, not only of aiding and abetting the misapplication of public funds, but of misapplying the funds himself. Testimony showed that Thompson placed Champion in charge of the day-to-day operations of the road department. Champion was present in the meeting where Campbell was hired. Testimony showed that he directed contractors Campbell, Slone, and Hays where to lay gravel, including instructing them to lay gravel on private property, and that he directed Gayheart's bridge building, much of which was

done on private property. This evidence is sufficient to show that Champion knowingly applied

public resources to private property. Champion's sufficiency claim must fail.

B

We next address the defendants' claim that the district court erred when it denied their

motion for a new trial based on alleged *Brady/Giglio* violations, as it is the only other claim in which

all the defendants join. *Brady* stands for the proposition that it is a violation of a defendant's due-

process rights for the prosecution to suppress evidence favorable to the defendant. *Brady v.*

*Maryland*, 373 U.S. 83, 88 (1963). To prove a *Brady* violation, the defendants must show three

elements, as set forth by *Strickler v. Green*, 527 U.S. at 281–82. They must establish (1) that the

evidence was favorable to them, (2) that it was suppressed (whether intentionally or not) by the

government, and (3) that prejudice ensued. *Giglio* modified *Brady* by holding that a new trial is not

automatically required when there has been a *Brady* violation, but only when the evidence was

material, when it could "in any reasonable likelihood have affected the judgment of the jury." *Giglio*

*v. United States*, 405 U.S. 150, 154 (1972) (internal quotation marks omitted).

As recent cases have indicated, this circuit has sometimes reviewed a district court's denial

of a motion for a new trial based on *Brady* violations under a de novo standard of review, and

sometimes under an abuse-of-discretion standard. *United States v. Douglas*, 634 F.3d 852, 860 (6th

Cir. 2011). We need not resolve the inconsistency today, however, because the defendants'

argument fails under either standard.

As the district court stated in its order denying defendants' motion, the defendants have failed to prove the second and third elements of their *Brady* claim. First, the defendants have failed to prove that any promises of immunity existed other than the ones that they were provided with by the government. The defendants were given the opportunity to develop the record with an evidentiary hearing, but failed to show that undisclosed grants of immunity existed. The worst the defendants were able to prove was that the government failed to provide them with some of the grand-jury transcripts containing evidence of immunity until the morning of the day that witness was to testify. However, this circuit has held that disclosures of favorable evidence made on the day of trial are not *Brady* violations, "unless the defendant has been prejudiced by the delay in disclosure." *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998). The defendants were given numerous other examples of witness immunity before trial began, and chose not to impeach witnesses with them.

In fact, as the district court pointed out, the defendants' trial strategy was to prove that the roads paved were public, not to prove that the witnesses had in fact not paid for paving on their private roads and drives. Therefore, defendants have not shown that they were prejudiced by the delay, because they have given no indication that they would have used the promises of immunity had they been disclosed earlier. For these reasons, we affirm the district court's denial of defendants' motion for a new trial on *Brady/Giglio* grounds.

C

Next, we address Combs's and Champion's evidentiary arguments. Both defendants argue that the district court erred when it allowed in evidence what they allege to be hearsay—the grand-jury testimonies of Tammy Brewer and Hoey Dobson. The district court determined that this evidence was admissible because it was not offered to prove the matter asserted; in fact, it was admitted with the precise understanding that the testimony was false and had served as the basis for the declarants' perjury convictions.

Combs argues that while the grand-jury testimony may have been admitted to have been false in some respects, it was nevertheless admitted for its truth in others. He states that Brewer's and Dobson's statements that they paid for their blacktop were false and acknowledged as such, but that their statements that they received blacktop, were given receipts, and did not know who paid for the blacktop were statements offered for their truth. Combs Brief at 39–40. Champion does not argue that Brewer and Dobson's testimonies were offered for their truth. Rather, Champion argues that there was "no way for [him] to challenge the alleged falsity of these statements." Champion Brief at 19.

We review the district court's evidentiary rulings for an abuse of discretion. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) ("All evidentiary decisions are reviewed under an abuse-of-discretion standard.")). A court abuses its discretion only if we are left with a "definite and firm conviction that the trial

court has committed a clear error of judgment." *Hall v. Liberty Life Assurance Co. of Boston*, 595 F.3d 270, 275 (6th Cir. 2010) (internal quotation marks omitted).

The district court did not abuse its discretion when it overruled defendants' hearsay objection. The court carefully considered whether the grand-jury testimony was being offered for its truth, determined it was not, and cited to relevant, binding precedent to support this decision. In fact, the case cited was on point. In it, this court stated:

> When statements are offered to prove the falsity of the matter asserted, there is no need to assess the credibility of the declarant. Since there is no need to assess the credibility of the declarant of a false statement, we know of no purpose which would be served by extending the definition of hearsay to cover statements offered for the falsity of the matter asserted. We therefore join those courts which have concluded that statements offered to prove the falsity of the matter asserted are not hearsay.

*Hathaway*, 798 F.2d at 905. Moreover, the Confrontation Clause is not violated by testimony that is not offered for the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes *other than* establishing the truth of the matter asserted.") (emphasis added).

The government's statements regarding Brewer and Dobson's grand-jury testimony, both during trial and during its closing argument, indicate that the government offered the unquestionably perjurious testimony precisely to prove that Brewer and Dobson made false statements under oath to cover up wrongful acts. The district court did not abuse its discretion when it determined that this testimony was not hearsay.

Champion also argues that the district court erred when it admitted the roughly thirty-second news clip of a television interview with Thompson. Champion argues that the "rule of completeness" required that the court admit the entire thirty-minute-long interview that the news station conducted with Thompson, and not the shorter clip that was actually played on air.[7] Champion cites no other legal authority in support of his position.

The court did not abuse its discretion when it overruled the defendants' objection that the rule of completeness required the government to play the entire television interview with Thompson. The common-law rule of completeness is partially codified in Federal Rule of Evidence 106, which states:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.

FED. R. EVID. 106. The district court noted that defendants' reliance on the rule of completeness was misplaced in this instance because "[t]his was not a situation where the government read a portion of the deposition and the [d]efendants then sought admission of the entire deposition in order to put the other portion in appropriate context. Although the news clip had been pared down, the government *was not in possession of the entire interview*." In other words, there was no complaint tenable under the rule of completeness because the government admitted 100% of what they were in possession of—the televised clip. Moreover, Champion has not offered any evidence that he was

---

[7]Generally, the evidence was admissible as a statement of a party opponent. FED. R. EVID. 801(d)(2)(A) (describing such a statement as "not hearsay").

that he was prejudiced by the admission of the clip and not the full interview. Champion's argument must fail.

D

Combs argues that the application of the statute against misappropriating funds, 18 U.S.C. § 666, was unconstitutionally applied, such that it will "embrace a substantial number of potentially unconstitutional applications." Combs Brief at 48–49. Combs further asserts that the manner in which the statute was applied was so "broad" as to result in "the burdening of innocent associations or expressions or statutes . . . creates unreviewable prior restraints on First Amendment rights and are overboard [sic] as a matter of law. When there is a realistic danger that a statute itself will significantly compromise recognized First Amendment protection of parties not before the Court[,] those statutes are subject to facial attack . . . ." *Id.* at 49.

Combs's argument is too vague to merit serious consideration. While overbreadth is of course a recognized concern, Combs provides the court with no reason to believe that the district court erred when it determined that 18 U.S.C. § 666 was not applied in an overbroad manner. The relevant section of the statute states:

> Whoever . . . being an agent of an organization, or of a state, local, or Indian tribal government, or any agency thereof . . . embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that . . . is valued at $5,000 or more, and . . . is owned by, or under the care, custody, or control of such organization, government, or agency . . . shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a)(1).  To make out a claim of a statute being applied in an overbroad manner, the

party claiming overbreadth must show that "the existence [of the statutory construction] . . . may

cause others not before the court to refrain from constitutionally protected speech or expression."

*United States v. Jeter*, 775 F.2d 670, 677 (6th Cir. 1985) (quoting *Broadrick v. Oklahoma*, 413 U.S.

601, 612 (1973)) (internal quotation marks omitted).  In order to implicate the overbreadth doctrine,

the "primary conduct which is affected by the law at issue must to a substantial extent be the kind

of expressive and associational behavior which at least has a colorable claim to the protection of the

First Amendment."  *Id.* at 678 (emphasis and alterations omitted).

The overbreadth doctrine does not apply in this case.  The statute, 18 U.S.C. § 666, does not

implicate the First Amendment, because no person has a constitutional right to misapply property.

Nor has the statute been applied in such a way as to threatened the legitimate exercise of First

Amendment rights.  Combs's constitutional argument is without merit.

E

Thompson and Adams argue that the government violated their due-process rights when the

prosecutor asked Eldon Hicks about Donnie Newsome's prior conviction, and when the prosecutor

made certain statements during closing argument.  We address these arguments in turn.

Before trial, Thompson moved to exclude evidence of corruption in prior county

administrations, including Donnie Newsome's conviction.  The government responded that it did

not intend to discuss prior political impropriety in Knott County, but that if the defendants pursued

an "everybody does it" defense that the government might "come back" with statements regarding past political corruption. The court granted the motion, "consistent with the Government's statements."

Because the court granted the defendants' motion to "limit" argument on past political corruption, Thompson and Adams now claim that the prosecutor's mentions of Newsome—three in total—constituted flagrant misconduct sufficient to warrant reversal. They argue that, though the remarks were isolated, the prosecutor "deliberately violated the court's order to get prejudicial and inadmissible evidence before the jury." The first reference to Newsome was the prosecutor's asking, "Was Donnie Newsome convicted of vote buying?" during Eldon Hicks's cross-examination. This was the only remark of the three to which the defendants objected. When Thompson and Adams objected to the question, the court admonished the jury, on the agreement of the parties, that Newsome's conviction "did not include as a factual basis . . . the building of bridges or the paving of roads." The second and third were remarks made during closing argument. The prosecutor said that the 2006 paving done by Thompson was "Donnie Newsome on steroids, this $1.5 million of blacktopping," and stated that the defendants had "kick[ed] it up a notch" from prior administrations, though conceding that "Donnie Newsome . . . handed out gravel like it was pizza."

"When addressing claims of prosecutorial misconduct, we first determine whether the challenged conduct was improper . . . ." *United States v. Johnson*, 581 F.3d 320, 329 (6th Cir. 2009). If the remark was improper, we analyze whether it was "flagrantly improper"—that is, whether (1) the prosecutor intended to mislead the jury; (2) whether the remark or remarks was isolated or

pervasive; (3) whether they were deliberately made; and (4) whether the overall evidence against the defendant was strong. We "review prosecutorial misconduct claims for an abuse of discretion." *Ibid.*

The prosecutor's remarks in this case do not require reversal, for several reasons. First, the court gave a swift curative instruction regarding the question the prosecutor asked Hicks during cross-examination. In light of that instruction, we do not believe the jury misunderstood the remark. *Johnson*, 581 F.3d at 330 (citing *United States v. Wilson*, 199 F. App'x 495, 498 (6th Cir. 2006)). Further, the government's remarks during closing argument are not only given wide leeway, *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008), but these remarks were made after the defense had appealed to the jury that conduct such as defendants' was not unusual in Knott County, stating, for example, that prior judges and administrations had directed employees to gravel the same areas as Thompson. The court expressly allowed the government to retort with comments about prior political corruption in the county in such an instance. The remarks made about Newsome do not require giving the defendants a new trial.

In addition to the statements regarding Newsome, the prosecutor, during closing argument, made a few other statements that Thompson and Adams now argue warrant reversal. The prosecutor stated that he had no doubt that the defendants were guilty, that the jury had a duty to hold the defendants accountable, that they had a "civic duty" to convict, and he hoped they would do their duty.

The defendants did not object to the prosecutor's closing argument below, so our review is for plain error only. *Henry*, 545 F.3d at 376. Plain-error review requires us to determine "whether (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Ibid.* (internal quotation marks omitted). Errors generally do not affect a defendant's "substantial rights" unless they affect the outcome of the trial. *United States v. Davis*, 514 F.3d 596, 615 (6th Cir. 2008).

The remarks the defendants complain amounted to plain error are in fact relatively harmless—only comprising a few sentences within thirty pages of closing argument. We give "wide latitude to a prosecutor during closing argument, . . . recognizing that inappropriate comments alone do not justify reversal where the proceedings were otherwise fair." *Henry*, 545 F.3d at 377. Defendants have not provided any evidence or case law suggesting that the prosecutor's remarks rose to the level of plain error or prevented a fair trial. Therefore, their argument must fail.

F

Combs and Champion appeal their sentences. Combs argues that, by determining the amount of restitution, the court engaged in improper fact-finding that increased the penalty for his offense, in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

*Apprendi* holds that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Ibid.*

Combs raised this objection in his sentencing memorandum, and it was addressed by the district court at the sentencing hearing. The district court stated, "I do not believe that the computation of loss in this case must be shown through evidence presented at trial under *Apprendi* . . ., so I will deny that objection."

The district court is correct. This court has held, in keeping with other circuits, that *Apprendi* does not apply to restitution calculations because the restitution statute does not contain a maximum amount. *United States v. Bearden*, 274 F.3d 1031, 1042 (6th Cir. 2001); *Dohrmann v. United States*, 442 F.3d 1279, 1281 (11th Cir. 2006); *United States v. Carruth*, 418 F.3d 900, 902–04 (8th Cir. 2005); *United States v. Wooten*, 377 F.3d 1134, 1144 n.1 (10th Cir. 2004); *United States v. Syme*, 276 F.3d 131, 159 (3d Cir. 2002); *United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000). The district court did not err when it determined that *Apprendi* does not apply to the determination of restitution. Combs's argument must fail.

Champion argues that his sentence was unreasonable because he was held jointly and severally liable with his co-defendants for the $238,793 in restitution ordered by the court. He claims that he should not bear liability for this amount because he was acquitted of Count One, the conspiracy count. Champion raised this argument in his sentencing memorandum and raised it in the sentencing hearing. The court nevertheless determined that Champion should be jointly and severally liable, simply stating, "I'm required under the law to impose restitution, and I'm finding that it's a joint and several obligation."

We review de novo whether restitution is legally permitted. *United States v. Comer*, 93 F.3d 1271, 1278 (6th Cir. 1996). We then review the amount of restitution ordered for an abuse of discretion. *Ibid.*

A "district court may consider acquitted conduct in determining a defendant's offense level under the Sentencing Guidelines if the government has proved by a preponderance that relevant, acquitted conduct has occurred." *Comer*, 93 F.3d 1284. A court, however, "may not attribute a loss to a defendant based on mere speculation." *Ibid.*

Champion was found guilty of misapplying public property; he was, therefore, required to pay restitution.[8] The district court was correct to require him to pay. Further, the district court did not err in determining that Champion was liable for the full amount of loss attributed to the other defendants. The government presented ample evidence that Champion was a participant in the misapplication of county property, making it appropriate for the district court to determine that Champion participated in the conspiracy, even if his participation was not proved beyond a reasonable doubt. Moreover, the court set the amount of restitution at a conservative one-quarter of the $780,000 the county could not account for. The court did not abuse its discretion in setting the amount of restitution. *Comer*, 93 F.3d at 1285.

---

[8]18 U.S.C. § 3663A(c)(1)(B) states that for "any offense . . . in which an identifiable victim or victims has suffered . . . pecuniary loss," the court "shall order, in addition to, . . . any other penalty authorized by law, that the defendant make restitution to the victim."

## III

Based on the foregoing review of the record, we find no error in the district court's decisions.

For this reason, the defendants' convictions and sentences are AFFIRMED.