RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0338p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

              *v.*                                    No. 08-1662

EARL JOHNSON,
              *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-80025—Victoria A. Roberts, District Judge.

Argued: July 31, 2009

Decided and Filed: September 18, 2009

Before: NORRIS and COLE, Circuit Judges; ADAMS, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Elizabeth L. Jacobs, LAW OFFICE, Detroit, Michigan, for Appellant. Kevin M. Mulcahy, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Elizabeth L. Jacobs, LAW OFFICE, Detroit, Michigan, for Appellant. Kevin M. Mulcahy, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

COLE, Circuit Judge. Defendant-Appellant Earl Johnson appeals his conviction by a jury of bank robbery and conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 371 and 2113(a) and (e) and premeditated murder in violation of 18 U.S.C.

_____

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

§ 924(j). Johnson seeks reversal of his conviction, claiming that: (1) the admission of tape-recorded statements by a non-testifying co-defendant violated the Confrontation Clause; (2) his counsel provided ineffective assistance by failing to prevent the admission of these statements; (3) the prosecution committed misconduct; and (4) the district court improperly admitted hearsay. For the following reasons, we **AFFIRM**.

## I. BACKGROUND

### A.     Factual background

At approximately 3:50 a.m. on December 14, 2001, several hooded males wearing black clothing and masks robbed an armored truck that was delivering cash to the Dearborn Federal Credit Union ("DFCU") in Dearborn, Michigan. As two guards were replenishing the automated teller machines ("ATMs") in the bank's parking lot and foyer, the robbers approached and began firing shots. One of the guards was killed, and the robbers left with $204,000 in cash and the deceased guard's .38 caliber revolver.

The DFCU robbery remained unsolved for several years, but in August of 2004, the Detroit office of the Federal Bureau of Investigation ("FBI") received a letter from Baron Nix-Bey, an inmate at the Ryan Correctional Facility of the Michigan Department of Corrections. The letter stated that Timothy O'Reilly, another inmate whom Nix-Bey had assisted with "legal work," had been bragging about participating in the DFCU robbery. FBI Agent Barry Higginbotham contacted Nix-Bey and asked him to take notes on his conversations with O'Reilly. Agent Higginbotham testified that he told Nix-Bey to be a good, active listener.

In October or November of 2004, Agent Higginbotham asked Nix-Bey if he would be willing to use a recording device in his conversations with O'Reilly. Higginbotham explained at trial that he "thought that would serve as the best evidence in later on criminal proceedings against Mr. O'Reilly and others, if we were successful in determining they had committed these crimes that they were bragging about doing." (Record on Appeal ("ROA") Vol. 4 at 139.) Nix-Bey agreed. When Nix-Bey was later

moved to the Macomb Correctional Facility, the FBI arranged for O'Reilly to be transferred there as well, and the two men were placed in the same cell.

On December 14, 2004, using a recording device disguised as a radio, Nix-Bey recorded a conversation with O'Reilly in the yard of the Macomb prison in which he asked O'Reilly for details about the DFCU robbery. O'Reilly provided extensive information, including the full names of the other participants in the crime. Using this information, Higginbotham contacted and obtained the cooperation of two of the other DFCU robbers, Johnson's co-defendants Khayyam Wilson and Henry Matthews. Through them, he confirmed O'Reilly's statements about the crime and learned more about the roles of the participants. Wilson and Matthews informed Higginbotham that Johnson had recruited them to participate. Johnson was arrested in December of 2004.

**B.      Procedural background**

A grand jury returned a second superseding indictment of Johnson and five others: O'Reilly, Wilson, Kevin Watson, Norman Duncan, and Archie Broom. Matthews was charged separately with one count of conspiracy to defraud the United States. The indictment charged Johnson with three counts: (1) conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 371 and 2113(a); (2) bank robbery in violation of 18 U.S.C. § 2113(a) and (e); and (3) premeditated murder with a firearm in violation of 18 U.S.C. § 924(j). Johnson's case was severed, and he was tried first.

Johnson's trial lasted eight days. Wilson and Matthews, who pleaded guilty, testified that Johnson had surveilled the DFCU prior to the robbery, participated in the robbery, and allowed the group to return to his house to divide the cash and listen to a police scanner for reports about the robbery. Matthews also testified that he, Johnson, Wilson, O'Reilly, and Duncan each received about $30,000 in cash from the robbery. Nix-Bey testified in detail about what O'Reilly had told him, and the district court admitted the tape-recording of their conversation into evidence over Johnson's objection. The jury found Johnson guilty of all three counts, and the district court sentenced him to sixty months of imprisonment on Count 1 and life imprisonment on Counts 2 and 3, all to be served concurrently. Johnson now appeals his conviction.

## II. ANALYSIS

### A.     The tape-recording was properly admitted

Prior to trial, Johnson moved to exclude the tape-recording, arguing that its admission would violate the Confrontation Clause, that O'Reilly's statements were not sufficiently against his penal interest to be admissible under Federal Rule of Evidence 804(b)(3), and that the statements were more prejudicial than probative in violation of Federal Rule of Evidence 403.  The district court denied the motion, holding that the Confrontation Clause was not implicated because the statements were not testimonial and that the statements were admissible under Rule 804(b)(3).

#### 1.     *The content of the tape-recorded statements*

On the recording, O'Reilly speaks at length about the robbery, naming each of his five co-defendants and identifying Watson as the killer of the armed guard.  He states that it was Johnson's idea to rob the ATMs, which were near the headquarters of Ford Motor Company, because Johnson (a Ford employee) thought the ATMs would contain large amounts of cash shortly after Ford issued certain profit-sharing checks to its employees.  O'Reilly states that Johnson surveilled the DFCU prior to the robbery and recruited two of his Ford co-workers to participate.  O'Reilly also refers to Johnson as "expendable" and a "dumb-ass" because Johnson underestimated the number of guards who would be in the armored truck and the amount of money that would be in the ATMs.

#### 2.     *O'Reilly's statements were not testimonial*

The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."  We review de novo claims that the admission of evidence violated

the Confrontation Clause.  *See United States v. Mayberry*, 540 F.3d 506, 515 (6th Cir. 2008).

In determining whether statements are testimonial, we ask whether the declarant "intend[ed] to bear testimony against the accused." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).  This, in turn, depends on "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id*.  Because O'Reilly did not know that his statements were being recorded and because it is clear that he did not anticipate them being used in a criminal proceeding against Johnson, they are not testimonial, and the Confrontation Clause does not apply. *See United States v. Johnson*, 440 F.3d 832, 843 (6th Cir. 2006) (holding that an unwitting declarant's secretly recorded statements to a close friend were nontestimonial); *see also United States v. Mooneyham*, 473 F.3d 280, 286-87 (6th Cir. 2007) (stating that co-defendant's out-of-court statements to an undercover officer whose status was unknown to the declarant were nontestimonial); *United States v. Watson*, 525 F.3d 583, 589 (7th Cir. 2008) ("[A] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes."); *United States v. Hendricks*, 395 F.3d 173, 182 n.9, 184 (3d Cir. 2005) (same); *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004) (same).  Johnson argues that our inquiry into whether the statements are testimonial should focus on Nix-Bey and the FBI's encouragement of his questioning, but our precedent makes clear that the intent of O'Reilly, the declarant, determines whether the statements on the tape-recording are testimonial.

Although *Crawford* clarified the requirements of the Confrontation Clause with respect to testimonial statements, it left open the question of whether nontestimonial statements continued to be governed by the test set forth in *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). *See United States v. Arnold*, 486 F.3d 177, 192-93 (6th Cir. 2007) (en banc). *Roberts* held that statements by an unavailable declarant were nonetheless admissible under the Confrontation Clause if they either fell into a firmly rooted hearsay exception or bore "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.  In the

recent cases of *Davis v. Washington*, 547 U.S. 813, 825 (2006) and *Whorton v. Bockting*, 549 U.S. 406, 420 (2007), the Supreme Court answered this question and explained that the Confrontation Clause has no bearing on nontestimonial out-of-court statements. Thus, *Roberts* no longer applies to statements such as O'Reilly's, and their admissibility is subject only to the Federal Rules of Evidence, which we analyze below. *See Arnold*, 486 F.3d at 192-93.

The Supreme Court's recent clarification of the scope of the Confrontation Clause also eliminates any need to analyze the admissibility of the tape-recording under the rule established in *Bruton v. United States*, under which "[a]n accused is deprived of his rights under the Confrontation Clause when the confession of a nontestifying codefendant that implicates the accused is introduced into evidence at their joint trial . . . even if the jury is instructed to consider the confession only as evidence against the codefendant." *United States v. Cope*, 312 F.3d 757, 780-81 (6th Cir. 2002) (citing *Bruton v. United States*, 391 U.S. 123, 137 (1968)). Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements. *See United States v. Pugh*, 273 F. App'x 449, 455 (6th Cir. 2008) ("[T]he statement at issue . . . is nontestimonial in nature, and therefore, does not implicate the Confrontation Clause as analyzed under *Bruton* or otherwise."); *see also United States v. Vargas*, 570 F.3d 1004, 1009 (8th Cir. 2009) (holding that *Bruton* does not apply to nontestimonial co-defendant statements); *United States v. Pike*, 292 F. App'x 108, 112 (2d Cir. 2008) ("[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* [] or *Bruton* []."). The inapplicability of *Bruton* and the Confrontation Clause to O'Reilly's statements also forecloses Johnson's argument that the tape-recording should have been redacted to eliminate the use of Johnson's name. *Cf. Gray vs. Maryland*, 523 U.S. 185, 191-92 (1998) (discussing when statements otherwise inadmissible under *Bruton* may be cured by redaction).

Although the parties do not discuss it, we also note that the *Bruton* rule guards against a risk that arises in joint trials, and Johnson and O'Reilly were not tried together. Therefore, even if *Bruton* did apply to nontestimonial statements, it is unclear that it

would apply to this case.  *See Adams v. Holland*, 168 F. App'x 17, 19 (6th Cir. 2005) (distinguishing *Bruton* because defendant and declarant were not tried jointly); *see also Hicks v. Straub*, 377 F.3d 538, 554 (6th Cir. 2004) (distinguishing *Bruton* because in a single-defendant trial the jury is not "'asked to perform the mental gymnastics of considering an incriminating statement against only one of two defendants'" (quoting *Frazier v. Cupp*, 394 U.S. 731, 735 (1969))).

> 3.     *The recording was admissible under the Federal Rules of Evidence*

Because O'Reilly's statements on the tape-recording are nontestimonial, "the only admissibility question . . . is whether the statement[s] satisf[y] the Federal (or State) Rules of Evidence." *Arnold*, 486 F.3d at 192-93 (citing *Davis*, 547 U.S. at 824).  Our standard of review of such issues is for abuse of discretion.  *See United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007).  For a statement to be admitted under the hearsay exception for statements against penal interest set forth in Rule 804(b)(3), the declarant must be unavailable, the statements must, "from the perspective of the average, reasonable person," be adverse to the declarant's penal interest, and corroborating circumstances must "truly establish the trustworthiness of the statement."[1] *See United States v. Tocco*, 200 F.3d 401, 414 (6th Cir. 2000); *see also Williamson v. United States*, 512 U.S. 594, 603-04 (1994) (discussing requirements for admission of evidence under Rule 804(b)(3)).  Here, the first prong of the analysis is satisfied because Johnson does not challenge the district court's conclusion that O'Reilly's likelihood of invoking the Fifth Amendment if called to testify rendered him unavailable as a witness.  The second prong is satisfied as well because from the perspective of an average, reasonable person the statements were adverse to O'Reilly's penal interest:  they admitted his participation

---

[1]Rule 804(b)(3) states that the following is not excluded by the hearsay rule if the declarant is unavailable as a witness:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed. R. Evid. 804(b)(3).

in an unsolved murder and bank robbery, exposing him to the possibility (and later, the reality) of a prosecution seeking the death penalty.

The third prong of Rule 804(b)(3)'s trustworthiness analysis requires us to focus not "on whether other evidence in the case corroborates what the statement asserts, but rather on whether there are corroborating circumstances which clearly indicate the trustworthiness of the statement itself." *See United States v. Franklin*, 415 F.3d 537, 547 (6th Cir. 2005). In his briefs, Johnson erroneously advances his arguments about the trustworthiness of O'Reilly's statements under the no-longer-applicable *Ohio v. Roberts* standard of "particularized guarantees of trustworthiness," 448 U.S. at 65, rather than the standard set forth in Rule 804(b)(3). However, the two analyses are similar, and under either standard the circumstances in this case were sufficient to corroborate the reliability of O'Reilly's statement. The fact that the jury heard a recording of O'Reilly making his statements eliminates the risk that the statements were inaccurately relayed to the jury (Johnson does not challenge the authenticity of the recording). O'Reilly and Nix-Bey were friends and confidants, as evidenced by testimony from Nix-Bey that even before the two of them became cell-mates, they saw each other every day at meals, engaged in numerous social activities together, and worked together on O'Reilly's legal matters. *See Franklin*, 415 F.3d at 548 (recognizing under *Ohio v. Roberts* analysis that closeness of relationship between declarant and informant bolsters trustworthiness of statement against penal interest). O'Reilly was unaware that he was being recorded and therefore could not have made his statement in order to obtain a benefit from law enforcement. *See Williamson*, 512 U.S. at 603 ("Even the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor."); *see also Franklin*, 415 F.3d at 548 (stating that the lack of such self-interested motives bolsters trustworthiness). O'Reilly's unflattering references to Johnson as "expendable" and a "dumb-ass" also suggest that he was not attempting to shift blame to Johnson. These circumstances adequately corroborate the trustworthiness of O'Reilly's statements and render them admissible under Rule 804(b)(3).

Johnson also has not established that the recording was more prejudicial than probative under Rule 403.**2** "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." *See Paschal v. Flagstar Bank*, 295 F.3d 565, 579 (6th Cir. 2002) (quotation marks omitted). The prejudice to Johnson caused by the recording was the result of the legitimately probative force of the evidence, not anything improper or unfair about it. The district court did not abuse its discretion in admitting the recording.

**B.      Ineffective assistance of counsel**

Johnson contends that his trial counsel was ineffective because he failed to challenge the admission of the tape-recording as a violation of the Confrontation Clause under *Bruton v. United States*, 391 U.S. 123 (1968). We generally do not review ineffective-assistance claims on direct appeal, but since the record is "adequate to assess the merits" of Johnson's claim, we will do so. *See United States v. Steverson*, 230 F.3d 221, 224 (6th Cir. 2000). As explained above, *Bruton* does not apply to the tape-recording, so Johnson's counsel's failure to object to its admission on *Bruton* grounds was not deficient. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

**C.      Prosecutorial misconduct**

Johnson asserts two instances of prosecutorial misconduct that he claims require a new trial.

*1.      Cross-examination of Johnson's wife*

Johnson asserts that the Government committed misconduct in its cross-examination of his wife (at the time of trial, his girlfriend) Kena Johnson ("Mrs. Johnson"). Johnson's defense at trial was that he could not have participated in the robbery, which took place in December of 2001, because he was still impaired by an

---

**2**Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Achilles-tendon injury sustained in April of that year. Johnson offered several witnesses to testify about his injury, including Mrs. Johnson and the surgeon who operated on him and monitored his recovery. Mrs. Johnson testified that Johnson was unable to drive a car after the injury, and that he had moved to his parents' one-story house from April of 2001 to February of 2002 to avoid climbing stairs.

The Government cross-examined Mrs. Johnson as follows:

**Government:** Do [sic] you ever work at the Black Orchid? . . .

**Mrs. Johnson:** No, I did not.

**Government:** Miss Johnson, isn't it true that you have given false names when you were contacted before by police?

**Mrs. Johnson:** No.

**Government:** Have you used the name Marie Bush?

**Mrs. Johnson:** No.

**Government:** Have you used the name Chanille Johnson?

**Mrs. Johnson:** No.

**Government:** Do you know who those people are?

**Mrs. Johnson:** Have no idea.

**Government:** What about the name Tiffany Watson?

**Mrs. Johnson:** No.

**Government:** Have you used -- isn't it true you've used a number of different dates of birth?

**Mrs. Johnson:** No.

**Government:** Isn't it true you've used at least three different Social Security numbers?

| | |
|---|---|
| **Mrs. Johnson:** | No. . . . |
| **Government:** | One more thing. You were born in Pennsylvania, correct? |
| **Mrs. Johnson:** | No. |
| **Government:** | Where were you born? |
| **Mrs. Johnson:** | Reno, Nevada. |
| **Government:** | You're aware that your husband has friends in Pennsylvania? |
| **Mrs. Johnson:** | No, I'm not. |

(ROA Vol. 5 at 75-76, 81.)

Johnson's counsel objected to this line of questioning and asked the judge to instruct the jury to disregard it. The Government claimed its questions were based in good faith on a Law Enforcement Intelligence Network ("LEIN") printout showing what appeared to be a number of aliases for Mrs. Johnson. After examining the printout, the judge observed:

> The record reflects a LEIN search on a Kena Johnson. For this Kena Johnson [*i.e.* the witness] it consistently has one date of birth, one driver's license number that are [sic] height and weight are 5'5, 125 pounds. Then there is a fourth record that does reflect a date of birth of Pennsylvania, different aliases, different birth dates. This [other] Kena Johnson is 5'1 and weighs a hundred and 60 pounds.

(ROA Vol. 5 at 85.) In an attempt to establish a good-faith basis for its questions, the Government called Agent Kerry McCafferty, who testified that he thought the fourth entry for "Kena Johnson" in the LEIN record referred to the witness, as well, because a separate search of "Kena Johnson" in the National Crime Information Center ("NCIC") database resulted in a "possible association" with "Tiffany Watson," who was one of the aliases associated with the fourth "Kena Johnson" entry in the LEIN record and who had the same birthdate as Mrs. Johnson. McCafferty found this connection persuasive despite the inconsistent height and weight provided for the fourth "Kena Johnson" entry

because "people generally do not give their correct height or their correct weight" during a traffic stop.  (ROA Vol. 5 at 91-96.)  Despite this explanation, the district court found that the Government's questioning had not been in good faith, and it instructed the jury as follows:

> During the testimony of Kena Johnson, the last witness we had before the lunch break, Mr. Bullotta made an effort to impeach her credibility by asking her whether she had used three different names, three different birth dates, three different Social Security numbers.  I am instructing you now to disregard that effort to impeach her credibility.  Disregard the questions and disregard the answers, all right?

(ROA Vol. 5 at 96.)   Even in light of this instruction, Johnson argues that the Government's cross-examination of Mrs. Johnson was misconduct warranting a new trial.

When addressing claims of prosecutorial misconduct, we first determine whether the challenged conduct was improper, and if it was, we proceed to analyze whether it was flagrantly improper, such that reversal is required.  *See United States v. White*, 563 F.3d 184, 193 (6th Cir. 2009).  To determine if improper statements were flagrant, we ask (1) whether they tended to mislead the jury; (2) whether they were isolated or pervasive; (3) whether they were deliberately made; and (4) whether the overall evidence against the defendant is strong.  *Id*.  To require reversal, the prosecutor's conduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *See Johnson v. Bagley*, 544 F.3d 592, 598 (6th Cir. 2008) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).   We review prosecutorial misconduct claims for abuse of discretion.  *See White*, 563 F.3d at 193-94.

Even assuming that the Government's cross-examination of Mrs. Johnson was improper, any impropriety was not flagrant.  Although the statements could initially have misled the jury about Mrs. Johnson's credibility, the court quickly issued a curative instruction, and nothing about this particular line of questioning suggests that the misimpression it might have created was not effectively cured by the instruction.  *See United States v. Wilson*, 199 F. App'x 495, 498 (6th Cir. 2006) (recognizing that a curative instruction may make it highly unlikely that improper comments misled the

jury); *see also United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) ("Ordinarily, a court should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may cure the error."). The challenged conduct was isolated to the cross-examination of one witness and related solely to her credibility. Although the questions were deliberately placed before the jury, they were not the kind of repeated errors that we have deemed "deliberate misconduct" in the past. *Cf. Girts v. Yanai*, 501 F.3d 743, 760 (6th Cir. 2007) (finding that prosecutor's "repeated references" to Petitioner's decision to refrain from testifying at trial "demonstrate[d] that the errors were not inadvertent"). Furthermore, the overall evidence against Johnson, including testimony by his co-conspirators, was very strong. Therefore, the Government's cross-examination of Mrs. Johnson does not require a new trial.

> 2.    *The Government's failure to notify defense counsel of impeachment evidence relating to Frederick Gaines*

Johnson also called Frederick Gaines, a friend, to testify about Johnson's injury. Gaines saw Johnson using crutches and wearing a "bandage" after the injury and visited Johnson in his parents' home. Gaines testified that in December of 2001, around the time of the robbery, Johnson asked him to return a Christmas toy he had bought for one of his children because Johnson was not mobile enough to do it himself. Following direct examination of Gaines, the Government asked for a sidebar, during which the following exchange occurred:

> **[Government]:** Out of an abundance of caution, I'm approaching to tell you that I plan on cross-examining this witness about his involvement in the offense, and there's two issues. One is to answer my questions, he may need to have counsel appointed. He may need to have counsel appointed to answer the questions that I want to pose.
>
> **The Court:** What do you think his involvement is?
>
> **[Government]:** He was asked to be the getaway driver and he had discussions about planning with Earl Johnson, although [he] did not go through with it and he told his girlfriend that he was that – went and reported it to DPD; that he was going to come in and lie for Earl Johnson. So we may call her as a rebuttal witness . . . . I asked Mr. Feinberg

initially if he was going to call Frederick Gaines, and he said he wasn't so – and I didn't want to turn that over before because I don't want to influence his testimony.  It's Cross-examination.  I don't have any duty to disclose that.  I certainly wanted to bring [it] to the Court's attention before I went into [it] out of an abundance of caution . . . .

(ROA Vol. 5 at 101, 103-04.)

The district court then appointed a lawyer for Gaines, and Gaines indicated that he would invoke his right to remain silent if asked about the statements he had made to his girlfriend.  With the agreement of both parties, the district court struck Gaines's entire testimony and instructed the jury to disregard it.  Johnson claims that the Government committed prosecutorial misconduct by withholding evidence bearing on whether Gaines would make a good witness in order to gain an unfair advantage at trial.  Johnson argues that his defense counsel looked suspicious for calling Gaines as a witness only to have his testimony struck.

Because Johnson did not raise this issue below, we review it for plain error.  *See United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006).  Plain-error review involves four steps:

> First, there must be an error or defect -- some sort of deviation from a legal rule -- that has not been . . . affirmatively waived by the appellant. Second, the legal error must be clear or obvious . . . . Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings.  Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error -- discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) (internal quotations marks and citations omitted).  "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The prosecutor has a duty to disclose *Brady* material even when the accused does not specifically request it.  *See United States v. Agurs*, 427 U.S. 97, 107 (1976).  This duty extends to impeachment evidence, but only if the

evidence is favorable to the accused in the sense that it would allow him to impeach government witnesses. *See Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *Blood*, 435 F.3d at 627 (quotation marks omitted).

Here, the Government did not violate *Brady* by not informing the defense of the evidence it planned to use to impeach Gaines until after Gaines's direct examination. The evidence in question was not favorable to Johnson; rather, it called a defense witness's credibility into question. Nor did the Government completely fail to disclose the evidence. Furthermore, the Government's delay is understandable, given that defense counsel initially told the prosecutor he was not planning to call Gaines as a witness. Thus, the Government's conduct was proper.

**D.     Hearsay**

Johnson also argues that the district court erred in admitting hearsay through the testimony of a Government witness, Tanisha Smith, Johnson's close friend and the sister of his co-defendant Matthews. At trial, Smith testified that while Johnson was visiting her house in December of 2001, she overheard him talking on his cellular phone about plans to rob the DFCU. Smith recalled that after Johnson ended the call, he "insinuated [to her] that something was going to take place" and that he was planning to "do an armed heist with an armed truck or a robbery" at the DFCU. (ROA Vol. 3 at 37.) Smith testified that after learning of the DFCU robbery on the morning news on December 14, 2001, she called Johnson. He agreed to meet her for breakfast, where he appeared nervous and indicated that Matthews had been involved in the robbery, though he provided no other details.

On direct examination, Smith testified that she did not report what she had learned to the police because certain statements her husband, Derek Smith, had made to her led her to believe that doing so would place her in danger:

**Government:** Why were you scared?

> **Mrs. Smith:** Derek had informed me that – . . . Derek had informed me that he heard someone mentioning that they were going to be killing people . . . . They were saying that people were going to get killed if they were running they [sic] mouth saying anything.
>
> **Government:** You heard that from Derek[?]
>
> **Mrs. Smith:** Yes.

(ROA Vol. 3 at 49-50.) Defense counsel objected to this testimony on hearsay grounds, but the trial court admitted it, determining that it was not being offered for the truth of the matter asserted but to explain why Mrs. Smith did not go to the police. On appeal, Johnson claims that the admission of this evidence was reversible error.

As we noted earlier, we review a district court's evidentiary rulings for abuse of discretion. *See Vasilakos*, 508 F.3d at 406. Federal Rule of Evidence 801(c) defines "hearsay" as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The district court concluded that the testimony at issue was offered to explain why Smith did not report her knowledge to the police. In other cases, we have affirmed the admission of similar evidence for background purposes. *See, e.g.*, *United States v. Goosby*, 523 F.3d 632, 638 (6th Cir. 2008) (DEA agent statements reconstructing "the sequence of events" in the investigation); *United States v. Aguwa*, 123 F.3d 418, 421 (6th Cir. 1997) (statements by agents explaining how they came to know of defendant).

We need not decide, however, whether the admission of Smith's statements was improper because even if it was, the error was harmless. *See United States v. Hernandez*, 227 F.3d 686, 696 (6th Cir. 2000) (erroneously admitted hearsay is harmless unless it is "more probable than not that the error materially affected the verdict"). While the challenged testimony was prejudicial in that it portrayed Johnson and his co-conspirators as violent and dangerous, it was cumulative of properly admitted testimony by Derek Smith himself. At trial, Derek Smith recounted multiple conversations in which Johnson referred to the possibility of killing one of the participants in the robbery

who was "talking, showing off everything and [was] going to get [them] caught." (ROA Vol. 3 at 96). Describing an incident in February or March of 2002 in which Johnson took him to the home of a man nicknamed "Beast," Derek Smith stated:

> **Mr. Smith:** After I left, me and Earl [Johnson] got back in the truck and we were talking and he said how they were going to – you know, if they could find the guy they were going to execute him.
>
> **Government:** Did Earl say why they were going to execute this guy?
>
> **Mr. Smith:** Because he was doing too much talking . . . .
>
> **Government:** Did Earl say whether this man had killed anyone before?
>
> **Mr. Smith:** Yeah he mentioned that.
>
> **Government:** What did Earl say about that?
>
> **Mr. Smith:** He said he was crazy, he don't mind shooting and killing anyone, so from the looks of it when I saw him I was like I can tell. He looked kind of evil.

(ROA Vol. 3 at 99-100.) Derek Smith testified that he had not gone to the police with his knowledge of the robbery because he was scared for himself and his family. In light of this testimony, any error in admitting Mrs. Smith's cumulative testimony could not have materially affected the verdict. *See, e.g.*, *Hernandez*, 227 F.3d at 696 (finding that erroneous admission of hearsay was harmless because it was thoroughly corroborated by properly admitted evidence).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Johnson's conviction.