# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED:  APRIL 29, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0732-MR

LISA R. HARVEY                                                            APPELLANT

|  | ON APPEAL FROM HARDIN CIRCUIT COURT |
|---|---|
| v. | HONORABLE KELLY M. EASTON, JUDGE |
|  | NO. 18-CR-00577 |

COMMONWEALTH OF KENTUCKY                                    APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Lisa Harvey and her codefendant, Rick Fisher, were tried jointly and convicted by the Hardin Circuit Court of complicity to murder and tampering with physical evidence.  Harvey was sentenced to thirty years in prison consistent with the jury's recommendation and she now appeals as a matter of right.  After review, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

Investigators found Andrew Folena's decomposing body beaten and buried in a wooded area bordering a cornfield close to his house.  Earlier, Folena had returned to his home to find his fiancée, Harvey, there along with two men, Fisher and Joseph Goodman, who had been staying in his house while he was away.  Unbeknownst to Folena, Harvey had ongoing sexual relations with Fisher and Goodman.

At trial Goodman testified that earlier on the day of the murder, Fisher and Harvey stated they planned to kill Folena, but Goodman did not think they were serious.  He stated that later that night he was in the basement and heard what he assumed must have been Folena trying to get in the house through the front door.  Unable to get into the house, Folena walked around to the back of the house.  After hiding in the basement for a moment, Goodman heard a commotion and looked in the backyard to see Fisher bludgeoning Folena with a baseball bat.  Harvey was positioned on top of Folena strangling him.

Goodman testified that he quickly packed his things, called his ex-girlfriend and asked her to alert the police, and ran out into the cornfield.  Goodman estimated that he stayed there about twenty minutes before Fisher found him and sent him back to the house.  A few days later Goodman's ex-girlfriend called the police who conducted a welfare check at the Folena residence.  As they approached the home they saw Fisher walking out of a wooded area.  The deputies observed that Fisher was muddy and sweaty.  Fisher told the deputies that his girlfriend, Harvey, lived at the home with her fiancé, but he had not seen the fiancé in several days.  The deputies spoke with Harvey who told them she lived at the home with her fiancé but she was not sure where he was.  After the deputies explained why they were there Harvey made a phone call to a person she claimed was Folena and gave the phone to one of the deputies to speak with the man.

The deputies were skeptical and asked Harvey for permission to search the property.  Initially Harvey declined but consented when she learned the

2

deputies would pursue a search warrant. While searching the property one of the deputies followed what appeared to be a recent trail in the cornfield behind the home and located a wheelbarrow, shovels and tarps near a patch of freshly disturbed earth. They also found a bloody baseball bat, metal hook tool and work gloves inside the house. A cadaver dog was called to the scene and Folena's decomposing body was found in a shallow grave under the disturbed earth. A medical examiner later determined that Folena died from a combination of manual strangulation and blunt-force trauma.

The jury convicted Harvey and Fisher of complicity to murder and complicity to tampering with physical evidence and recommended a total sentence of thirty years for each defendant. Harvey appeals as a matter of right, raising several errors: (1) the trial court erred by not requiring redaction of Fisher's confession prior to its introduction; (2) the Commonwealth's Attorney improperly interjected her own testimony; (3) the trial court erred by denying a second competency evaluation; and (4) cumulative error. We note that the first two issues were raised in *Fisher v. Commonwealth,* 2019-SC-0738-MR, 2021 WL 1133592, at *1 (Ky. Mar. 25, 2021). Because the first two alleged errors are the same as those addressed in our recent *Fisher* decision, we reiterate our analysis and address the additional arguments in turn.

## ANALYSIS

I. **Admitting Fisher's out-of-court statements against Harvey did not violate the Confrontation Clause or the Rule Against Hearsay.**

3

While in custody at the Hardin County Detention Center Harvey and Fisher discussed the events with their respective cellmates. Neither Harvey nor Fisher testified at their joint trial, but three of their former cellmates did. If all three cellmates are believed, Harvey and Fisher independently confessed to their participation in the murder.

Hakeem Randall testified that he lived in a cell with Fisher for approximately two months. During that time, Fisher said that he was in custody for murder because he beat a man in the head after getting into an argument. Fisher bragged that he could "beat the charge" because he was not the cause of death. Fisher said he was accompanied by a female who used a necktie to strangle the man and the man's inability to breathe was what killed him. Fisher told Randall he used a wheelbarrow to move the man's body to the wooded area of a cornfield and then buried it. Fisher also told Randall that the female was crazy because she kept the necktie and used it as a belt.

Jayden Grissom testified that he shared a cell with Fisher for several weeks and during that time Fisher told him about the murder. Fisher said that he got angry about Harvey's relationship with another man, so he struck the other man multiple times with a blunt object and later buried his body. Fisher told Grissom that Harvey was with him during the assault and strangled the man with a necktie.

Tonya Dean testified that she lived in a cell next to Harvey for approximately two months. One night Harvey came to her and asked to talk. Harvey told her that her "sugar daddy" was murdered and that during the

4

murder she laid on top of him to protect him from being beaten with a baseball bat. After Dean told Harvey that she did not believe her, Harvey said she had actually strangled her "sugar daddy" with a necktie and two men beat him to death with a baseball bat. Harvey said they used a wheelbarrow to move his body before burying it. Harvey bragged that the necktie used to strangle the man would never be found because she wore it into the jail as a belt. Harvey was in fact wearing a necktie when she was taken into custody at the jail.

During trial, counsel and the trial court discussed objections to statements made by both defendants to their cellmates. Fisher's and Harvey's independent statements to their cellmates were consistent to the extent that each defendant implicated themselves and each other in the same way. Fisher said he hit Folena and Harvey strangled Folena. Harvey said the same, although she suggested a third person was also involved in the beating. The trial court stated its ruling of admissibility on the record and stated that a written order would be entered later due to the importance of the issue.

In a post-trial order, the trial court concluded that admitting Fisher's non-testimonial statement against Harvey did not violate Harvey's Sixth Amendment Confrontation Clause right. The trial court further determined that the statements were admissible as statements against interest under Kentucky Rule of Evidence (KRE) 804(b)(3).

Harvey claims the trial court erred by admitting Fisher's hearsay statement without redaction in violation of the Confrontation Clause. We recently discussed the admission of jail cellmate statements in Fisher's matter

5

of right appeal to this Court and clarified the standards for admitting hearsay against a criminal defendant under the Confrontation Clause. *Fisher,* 2021 WL 1133592, at *1. In a mirror image of the claim before us now, Fisher claimed that the trial court erred in admitting Harvey's hearsay statement made to Dean without redaction in violation of the Confrontation Clause. The Court held that admission of Harvey's out-of-court statements against Fisher did not violate the Confrontation Clause or the rule against hearsay. Applying the principles enunciated in *Fisher,* we find that the admission of Fisher's out-of-court statements against Harvey also did not violate the Confrontation Clause.

## A. The Confrontation Clause applies only to testimonial hearsay statements.

As this Court has recognized, the Supreme Court held that "the Confrontation Clause of the Sixth Amendment forbids admission of all testimonial hearsay statements against a defendant at a criminal trial unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination." *Bray v. Commonwealth,* 177 S.W.3d 741, 744 (Ky. 2005) (citing *Crawford v. Washington,* 541 U.S. 36, 68 (2004), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010)). Prior to *Crawford,* the admissibility of hearsay that incriminated an accused was premised on a judicial determination of reliability, which the Court found was an amorphous and unreliable standard. *Crawford*, 541 U.S. at 62. The primary focus in applying *Crawford* is whether the hearsay statement offered against a criminal defendant is testimonial. *Id.* at 68. The Court explained:

6

The text of the Confrontation Clause . . . applies to "witnesses" against the accused—in other words, those who "bear testimony." "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."

*Id.* at 51 (internal citation omitted). As we stated in *Fisher,* determining whether a statement is testimonial is a declarant-centric inquiry. 2021 WL 1133592, at *2 (citing *United States v. Johnson,* 581 F.3d 320, 325 (6th Cir. 2009)).

Pursuant to *Bruton v. United States,* 391 U.S. 123, 137 (1968), a pre-trial confession of one codefendant may not be used as evidence in a joint trial unless the confessing codefendant takes the stand. Further, a limiting instruction is not a sufficient substitute for a defendant's constitutional right of cross-examination. *Id.* "*Bruton* simply extends to joint trials *Crawford*'s prohibition against out-of-court *testimony,* protecting the accused in a joint trial from the incrimination of his non-testifying codefendants' hearsay statements." *Fisher,* 2021 WL 1133592, at *3. Additionally, *Richardson v. Marsh,* 481 U.S. 200, 211 (1987), held that redaction of a statement to omit reference to the accused may satisfy *Bruton* and, therefore, Confrontation Clause protections.

As this Court has explained, if a codefendant's out-of-court statement is non-testimonial neither *Crawford, Bruton,* nor *Richardson* bars potentially admissible statements. *Fisher,* 2021 WL 1133592, at *3. With these standards in mind, we turn to Harvey's arguments.

7

## B. Fisher's out-of-court statements were not testimonial, so they were not rendered inadmissible under the Confrontation Clause.

In this case Fisher made voluntary, unprompted out-of-court statements to two cellmates, Randall and Grissom. These statements were offered at trial as evidence against Harvey, but Fisher did not testify at trial and was at no point subject to Harvey's cross-examination. Fisher's statements incriminated himself and Harvey. Fisher told Randall that he was accompanied by a female who used a necktie to strangle a man and the strangulation, not the beating, caused his death. Fisher also told Randall that the female was crazy because she kept the necktie and used it as a belt. Additionally, Fisher told Grissom that Harvey was with him during the assault and strangled the man with a necktie. "[O]nly if these statements were testimonial under *Crawford* was the trial court obligated to exclude the statements under *Bruton* or redact them under *Richardson*." *Fisher,* 2021 WL 1133592, at *4.

> What constitutes a testimonial statement is an objective circumstantial inquiry viewed from the declarant's perspective, a decidedly declarant-centric inquiry. The United States Supreme Court clarified in *Davis* [*v. Washington,* 547 U.S. 813, 822 (2006)] that it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate. Circumstances tending to indicate a statement is testimonial include when the statement describes a past event, as opposed to an immediate, ongoing event like an emergency; the apparent, primary purpose of the interrogation or conversation is to use the statements obtained as evidence in a prospective criminal prosecution; and particularly where the interrogation, if the exchange can be characterized that way, is formally arranged or conducted, especially by an officer or agent of the state intending to elicit statements as evidence . . . .
>
> Whether a statement is testimonial depends solely on the circumstances of the declarant himself at the time he made the statement, not whether a person who heard the statement

8

eventually repeats under solemn oath what she allegedly heard the declarant say.

*Id.* (quotations and internal citations omitted).

Fisher's statements were not testimonial under *Crawford.* Fisher's statements to Grissom and Randall were accounts of past events, which may tend to indicate a statement is testimonial. But these statements were not originally made to an officer, made during interrogation, or made with the primary intent that they be used in a criminal prosecution. These incriminating statements were apparently made in what objectively seemed to be a private conversation. As held in *Fisher,* "the trial court was correct when it concluded that, as a general matter, conversations between cellmates will not be testimonial under the Confrontation Clause. Consistent with federal authority, jailhouse conversations between cellmates are not typically attended by the above-listed circumstances that indicate a statement is testimonial." *Fisher,* 2021 WL 1133592, at *6.[1]

Harvey emphasizes that each of the testifying cellmate witnesses spoke to police in an investigative setting. However, when examining the admissibility of hearsay statements under the Confrontation Clause we look to the setting in

---

[1] While the *Davis* Court was not faced with statements made outside of questioning by law enforcement, it used "statements from one prisoner to another" as an example of "clearly nontestimonial" statements. 547 U.S. at 825. *See also United States v. Pelletier,* 666 F.3d 1, 9 (1st Cir. 2011) (holding that statements made by one inmate to another are not testimonial); *United States v. Smalls,* 605 F.3d 765, 778 (10th Cir. 2010) (holding that a recorded statement by a codefendant to a confidential informant known only to the codefendant as a fellow inmate was "unquestionably nontestimonial"); *United States v. Johnson,* 495 F.3d 951, 976 (8th Cir. 2007) (holding that statements by a codefendant to a fellow inmate "fall safely outside the scope of testimonial hearsay").

9

which the statements are made. Here, Fisher's cellmates testified about statements that Fisher made to them in a jail setting, not any statements Fisher, Harvey, or the cellmates may have otherwise made to police or under circumstances indicating testimonial intent.

Because Fisher's statements were nontestimonial, the statements did not implicate the Confrontation Clause under *Crawford,* 541 U.S. at 68. Since Fisher's statements were nontestimonial, the Commonwealth also was not required to exclude Fisher's statements under *Bruton,* 391 U.S. at 123, or redact the statements under *Richardson,* 481 U.S. 200. The trial court correctly ruled that the admission of Fisher's statements to his cellmates did not violate the Confrontation Clause.

## C. Fisher's out-of-court statements are otherwise admissible under KRE 804(b)(3) as statements against penal interest.

Because Fisher's statements were nontestimonial, the admissibility of the statements was governed by the Kentucky Rules of Evidence, not the Confrontation Clause. The trial court held that Fisher's statements implicated him in Folena's murder, rendering it admissible as an admission of a party pursuant to KRE 801(b)(1). This Court applied the KRE to determine the admissibility of Harvey's statements in *Fisher.* To the extent Harvey's statement also asserts that Fisher was complicit in the murder with Harvey under Kentucky Revised Statutes (KRS) 502.020, it is admissible as a statement against penal interest under KRE 804(b)(3). *Fisher,* 2021 WL 1133592, at *6.

10

KRE 801 defines hearsay as an out-of-court statement offered to prove the truth of the matter asserted. Hearsay is generally inadmissible. The Commonwealth sought to introduce Fisher's statements not just as evidence against Fisher, but also to prove that Harvey was the woman with whom Fisher admitted he was complicit. So to the extent Fisher's statements were an assertion that Fisher and Harvey were complicit with one another, the statements are hearsay.

KRE 804(b)(3) creates an exception to the hearsay rule for statements made against the declarant's interest if the declarant is unavailable to testify at trial. Where the statement exposes the declarant to criminal liability, sufficient corroboration must indicate the trustworthiness of the statement. A declarant may be unavailable to testify for purposes of KRE 804(b)(3) when he invokes his Fifth Amendment right to remain silent and avoid self-incrimination. KRE 804(a)(1). Fisher was unavailable to testify at trial, having invoked his right to avoid self-incrimination.

While sitting in his jail cell, Fisher asserted to Randall that while he beat a man he was accompanied by a woman who ultimately killed Folena. He also told Grissom that Harvey was with him during his assault on Folena and that Harvey strangled Folena with a necktie. These statements included details of Fisher's involvement, such as him admitting to moving Folena's body and burying him. It was clearly against Fisher's penal interest to admit his involvement in Folena's murder, i.e., it was directly against his penal interest to admit complicity. As this Court concluded in *Fisher*,

11

The trial court found correctly within its discretion that the statements were corroborated by Goodman's testimony and by the totality of forensic and other circumstantial evidence. Particularly corroborating was the fundamental consistency between Fisher's and Harvey's independent accounts to their respective cell-mates.

2021 WL 1133592, at *7. Therefore, Fisher's statements fell within the exception of KRE 804(b)(3) and it was not error for the trial court to admit Fisher's unredacted statements as evidence against Harvey.

## II. The Commonwealth's Attorney's questioning techniques were improper but do not warrant reversal.

Harvey argues that the Commonwealth's Attorney used improper questioning techniques at trial in her questioning of Detective Priddy, who was a lead investigator in the murder investigation. While questioning Detective Priddy the prosecutor asked when particular items of discovery were provided. Detective Priddy testified that before trial she and the prosecutor prepared an evidence log documenting when discovery was provided. Detective Priddy testified that she helped with compiling the evidence log but was told by the prosecutor when discovery was turned over to the defense.

The timing of discovery was relevant to where the testifying cellmates could have obtained their knowledge of the details of the murder. Harvey had cast doubt on whether Harvey's and Fisher's former cellmates, Dean and Grissom, had learned the details of the crime from the defendants themselves or if they had learned details by looking at the defendants' discovery materials while the defendants were away from their cells. The purpose of the prosecutor's line of questioning was to prove that the cellmates could not have had access to that information through the defendants' discovery materials

12

since discovery had not progressed very far when Grissom and Fisher or Harvey and Dean were cellmates. Therefore, the cellmates could not have known details of the murder by reading defendants' copies of discovery.

> Since the prosecutor and Detective Priddy had worked together over the course of the investigation and had conferred about the discovery before trial, Detective Priddy may have had some conceivable familiarity with the progression of discovery disclosures. But it was apparent at trial that Detective Priddy did not have such personal knowledge or memory of the specific discovery timeline. The Commonwealth's Attorney resorted to highly suggestive and leading questioning during direct examination. The Commonwealth's Attorney put a purported discovery log in front of Detective Priddy on the witness stand, and then seemed to point to or otherwise suggest specific entries in the log to prompt Detective Priddy's responses. This became a pattern for that topic of inquiry. As examples of the Commonwealth's Attorney's questions:
>
>> "Were you present in my office when we typed this up?"[2]
>> . . .
>>
>> "Do you know when the next batch of information would have come into the Commonwealth's office?"[3]
>> . . .
>>
>> "And I wouldn't have gotten anything else until August 3rd?"[4]
>> . . .
>>
>> "Were we able to note when the preliminary diagnosis from the medical examiner's office was given to me?"[5]

*Fisher,* 2021 WL 1133592, at *8.

---

[2] I.e., "I typed this up."

[3] I.e., "My office turned this batch of information over at this time."

[4] I.e., "These are the documents I (or my office) would have had on August 3rd."

[5] I.e., "This was when I (or my office) received the preliminary diagnosis from the medical examiner's office."

13

Harvey objected to this line of questioning and the trial court directed the prosecutor to limit the questioning to matters of which the detective had personal knowledge. However, the line of questioning continued for several more lines thereafter.

Harvey argues that the Commonwealth's Attorney improperly questioned Detective Priddy at trial, allowing the prosecutor to testify vicariously through the witness. The implication of the prosecutor's testimony was to bolster the testimony of the jailhouse informants who had already denied looking through the defendants' discovery. Harvey bases her claim on Kentucky Rules of Professional Conduct (SCR) 3.130-3.4(e) and 3.130-3.7, both rules against counsel offering testimony at trial, and also KRE 603 and 802. "Because errors of this sort implicate constitutional rights, if it was indeed error, we may only affirm if we conclude this alleged error was harmless beyond a reasonable doubt." *Fisher,* 2021 WL 1133592, at *7. Fisher presented this same argument on appeal and we restate the conclusions reached in that case.

This Court held that:

For the Commonwealth's Attorney to persist in this manner was not proper and was, in fact, error. SCR 3.130–3.4(e) forbids a lawyer from asserting matters of personal knowledge unless testifying as a witness. SCR 3.130–3.7 forbids a lawyer's advocacy in a trial if the lawyer is expected to be a witness. Deliberate violations of these rules, depending on how deliberate and effective they are, can amount to prosecutorial misconduct and might require reversal.

The purpose of these rules against lawyer testimony and rules like KRE 603, especially in the criminal context, is not only to avoid the obvious biases an attorney has as advocate for her own client but also because improper suggestions, insinuations, and, especially, assertions of personal knowledge made by a prosecutor are apt to

14

carry much weight against the accused when they should properly carry none.  In our precedent is a longstanding, sensitive standard that requires reversal when any statement of fact outside of the evidence is made to the jury which may be in the slightest degree prejudicial to the rights of the accused.

Fisher's claim here is similar to the Appellant's claim of error in *Holt v. Commonwealth* [219 S.W.3d 731, 732 (Ky. 2007)].  This Court in *Holt* characterized the prosecutor's conduct as taking "broad liberties" in the mode of examination, whereby the Commonwealth's Attorney effectively testified "through" a witness. The Commonwealth's Attorney had met with her witness before trial to discuss the substance of his prospective testimony.  The Commonwealth's Attorney expected the witness to testify at trial that the defendant, Holt, admitted to the witness his involvement in the crime.  But on direct examination, the witness balked, not responding as the prosecutor had hoped or anticipated.  The Commonwealth's Attorney then asked outright, "Do you remember talking to me this morning? . . . Do you remember telling me that [Holt] told you that [he committed the crime]?"  By doing this, the Commonwealth's Attorney was indirectly making assertions and establishing facts regarding's Holt's guilt, not properly drawing those facts from the witness's own recollection and understanding.

This Court held reversible error in *Holt* for a prosecutor to testify to facts beyond the record through questioning, especially where the witness's testimony concerns a defendant's out-of-court admission to a crime.  The suspect prosecutorial conduct is a manner of questioning that places the prosecutor in the position of making a factual representation.  *Holt* articulates a particularly sensitive standard toward these violations.  The majority in *Holt* also expressly rejected the dissent's more tolerant approach toward a prosecutor's trying to make the best of a bad situation with a difficult witness.  Hardly a lawyer who has tried a case has not been disappointed by the testimony of a witness on direct examination.  Our rules do not provide, however, that when the witness disappoints, the lawyer may testify in his stead.

A review of the present trial record raises concerns.  The questioning seemed intentional and persistent, and it was self-admittedly unnecessary in light of available documentary alternatives.[6]  The Commonwealth's Attorney was feeding a witness

---

[6] The Commonwealth's Attorney stated in conference, "I can get a certified copy [of the discovery timeline]."  Trial Recording, 10/18/19, 9:31:15 AM.

facts beyond the witness's personal knowledge through leading questions and gestures, something that would have been apparent to the jury. The Commonwealth's Attorney thus improperly placed her credibility in issue as an unsworn witness against Fisher. Her questioning was improper.[7] As a brief aside, the Commonwealth's Attorney might have attempted properly to refresh the witness's recollection per KRE 612. But such a writing cannot be read aloud under the pretext of refreshing the witness's recollection." That is what occurred here, so it cannot be affirmed as a routine refreshing of a witness's recollection.

Ultimately, while this is a close case considering the strict standard articulated in *Holt*, we carefully conclude this was not a case of reversible prosecutorial misconduct. In distinguishing the immediate case from the outcome in *Holt*, we cannot help but account for the different circumstances of the case before us. In *Holt*, the prosecutor herself practically supplied a purported confession of a criminal defendant to the jury directly and unqualifiedly when she found herself faced with a recalcitrant witness. Here, the Commonwealth's Attorney used suggestion to work with a witness that was simply unprepared to testify to the unfamiliar details of the discovery timeline. This Commonwealth's Attorney did not misrepresent the discovery timeline. Available certifiable documentation would have proven the same facts Detective Priddy parroted on the stand. Detective Priddy would likely have said the same things had she been properly prepared for trial. In *Holt*, by contrast, the Commonwealth's Attorney's statement, made four different times, was directly contrary to the witness's testimony, as the witness persistently denied ever sharing the confession with the prosecutor.

Before us now is perhaps nothing more than an ill-prepared witness. What the Commonwealth's Attorney added to Priddy's testimony did not lend the sort of central, necessary support to the Commonwealth's case as the alleged confession did in *Holt*. The Commonwealth had otherwise overwhelming evidence against Fisher, so we are satisfied that this error did not achieve Fisher's conviction. Though we do not retreat from the sensitive standard for this form of misconduct, attorney testimony, the context in

---

[7] "What is also troubling was that this testimony went to an important issue of fact, namely whether Grissom's testimony of Fisher's hearsay admission was true. Both the defense and the Commonwealth recognized Grissom's credibility was a considerable issue at trial. Indeed, proving the cellmate's testimony, testimony that included a purported admission, arguably depended on proof of the discovery timeline." *Fisher*, 2021 WL 1133592, at *9, n.83.

16

which it occurs deserves more consideration than *Holt* seems to suggest. Holt's circumstances presented an evident, shocking case of misconduct.

*Id.* at *8–*10 (internal quotations and citations omitted).

Likewise, overwhelming evidence was presented against Harvey as to her involvement in Folena's murder so we are similarly satisfied that this error did not achieve Harvey's conviction. This Court concluded that while the line of questioning in this case was improper and "warrants our disapproval," Fisher was not entitled to reversal for the error. *Id.* at *10. We also hold that Harvey is not entitled to reversal and "reiterate the higher standard to which we hold the Commonwealth's Attorneys as a matter of course. So we carefully affirm the judgment notwithstanding this conduct, not because it is particularly tolerable but because we find the error happened to be harmless beyond a reasonable doubt." *Id.*

### III. The trial court did not err by denying Harvey's request for a second competency evaluation.

Prior to trial Harvey moved for a competency evaluation pursuant to KRS 504.080. The motion was granted and Harvey was examined at the Kentucky Correctional Psychiatric Center (KCPC). A competency hearing was held on February 12, 2019, after Harvey returned from KCPC. The trial court found Harvey competent to stand trial and scheduled a jury trial to begin on October 14, 2019.

On October 8, 2019, Harvey's counsel informed the trial court that she believed Harvey was no longer competent to stand trial and requested a second competency evaluation. Defense counsel told the trial court that she had to

17

leave the jail during her last meeting with Harvey because nothing productive was happening. She also told the trial court that Harvey was unable to assist in her defense. The trial court denied the request, stating that Harvey had already been thoroughly evaluated for competency and found competent. In the court's view, nothing concrete was presented to justify halting the proceedings on the eve of trial to have Harvey reevaluated. A written order denying a second competency evaluation was later entered.

On appeal, Harvey argues that both substantial evidence and reasonable grounds existed for the trial court to believe that she was incompetent to stand trial or be sentenced. Harvey maintains the trial court ran afoul of her constitutional right to a competency hearing by declining to hold a second competency hearing or order another competency evaluation.

The United States Constitution prohibits trying a defendant who is incompetent to stand trial. *Drope v. Missouri,* 420 U.S. 162, 173 (1975). KRS 504.100(1) provides that "[i]f upon arraignment, or during any stage of the proceedings, the court has reasonable grounds to believe the defendant is incompetent to stand trial, the court shall appoint at least one (1) psychologist or psychiatrist to examine, treat and report on the defendant's mental condition." These statutory and Constitutional interests trigger different requirements:

> Due process under the Fourteenth Amendment requires that where substantial evidence that a defendant is not competent exists, the trial court is required to conduct an evidentiary hearing on the defendant's competence to stand trial. In contrast, under KRS 504.100, "reasonable grounds to believe the defendant is incompetent to stand trial" mandates a competency examination,

18

> followed by a competency hearing. Thus, while the failure to conduct a competency hearing implicates constitutional protections only when "substantial evidence" of incompetence exists, mere "reasonable grounds" to believe the defendant is incompetent implicates the statutory right to an examination and hearing.

*Woolfolk v. Commonwealth,* 339 S.W.3d 411, 422 (Ky. 2011) (internal citations omitted).

A defendant is competent to stand trial if she can "consult with [her] lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against [her]." *Godinez v. Moran,* 509 U.S. 389, 396 (1993). This Court reviews a trial court's competency decision by determining "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Woolfolk,* 339 S.W.3d at 423 (citations omitted).

Eight months prior to trial Harvey was evaluated for competency by a KCPC psychologist. During this evaluation Harvey acknowledged her past suicide attempts and persisting suicidal ideations, previous prescriptions for antidepressants and other medications, and her extensive past use of drugs and alcohol which began around age ten. The KCPC evaluator prepared a sixteen-page report. She concluded that Harvey could appreciate the nature and consequences of the proceedings against her and had the ability to rationally participate in her own defense. Harvey's counsel stipulated to the report and did not dispute the KCPC evaluation. The trial court concluded that Harvey was competent to stand trial.

19

A mere six days prior to trial Harvey's counsel requested a second competency evaluation but failed to present proof of any change in Harvey's mental condition since the last competency evaluation. Although defense counsel claimed that Harvey recently exhibited behavior raising new issues as to competency, she refused to provide specific evidence of Harvey's alleged mental decline out of fear of violating the attorney-client privilege. As the trial court properly noted, it was incumbent on Harvey's counsel to make an affirmative showing and voicing general concerns but then invoking the attorney-client privilege was not sufficient. Counsel mentioned possibly filing a KRS Chapter 31 motion for funds to hire another expert to evaluate Harvey's competency, but did not pursue that route.[8] Simply put, counsel's general assertions do not satisfy the constitutional or statutory requirements for ordering another competency evaluation.

"Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." *Drope,* 420 U.S. at 180. The Commonwealth asserts that throughout the course of the proceedings Harvey

---

[8] Indigent defendants often make motions for Chapter 31 funds *ex parte. See Daniel v. Commonwealth,* 607 S.W.3d 626, 634 (Ky. 2020); *Johnson v. Commonwealth,* 553 S.W.3d 213, 219 (Ky. 2018); *Commonwealth v. Wooten,* 269 S.W.3d 857, 859 (Ky. 2008). Just as parties use *ex parte* communications to discuss the need for Chapter 31 funds, *ex parte* communications can be used to discuss the need for a competency evaluation. Kentucky Supreme Court Rule (SCR) 4.300, Canon 2, Rule 2.9 allows a judge, with consent of the parties, to "confer separately with the parties and their lawyers in an effort to settle matters pending before the judge." Defense counsel could have requested an *ex parte* discussion regarding the information she was reluctant to reveal in court.

20

never displayed irrational behavior and her demeanor in court was always appropriate. Competency is capable of change over time and courts must be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence. *Id.* at 181. But the record in this case reflects no such circumstances.

After the trial court denied Harvey's request for a second competency evaluation the trial proceeded, and no further mention was made regarding competency until the sentencing hearing. At that time, defense counsel again indicated that Harvey was not competent and stated concern that Harvey's drug use had "ruined her brain." Counsel also stated that Harvey could not recount basic biographical information about herself. The trial court again denied the request for a competency evaluation.

"Defense counsel's statements alone could not have been *substantial* evidence" of grounds for a new competency evaluation. *Padgett,* 312 S.W.3d at 349. The information provided by defense counsel prior to trial and during the sentencing hearing did not constitute substantial evidence or a reasonable ground to believe Harvey was incompetent. Moreover, the trial court has broad discretion in determining whether to order a reevaluation for competency. *Quarels v. Commonwealth,* 142 S.W.3d 73, 84 (Ky. 2004).[9] The trial court was

---

[9] *See also Pate v. Commonwealth,* 769 S.W.2d 46, 47 (Ky. 1989) (holding that the trial court did not err in refusing to order a second competency hearing even though a psychiatrist testified the defendant suffered from schizophrenia and was mildly retarded, the defendant attorney said she could not communicate with her client, and the defendant testified that he could not remember confessing to the crimes); *Harston v. Commonwealth,* 638 S.W.2d 700 (Ky. 1982) (holding that the trial court did not abuse its discretion when it denied two requests to re-open a

in the best position to observe Harvey's conduct and demeanor from the outset of the proceedings and to evaluate such throughout the course of the proceedings. Because of this position, the trial court's evaluation is entitled to substantial deference. *Woolfolk,* 339 S.W.3d at 423. Given only the general statements by defense counsel regarding her interactions with Harvey, the trial court correctly denied the request for a second competency evaluation. This determination was not an abuse of discretion under constitutional or statutory standards.

**IV. No cumulative reversible error exists.**

Harvey claims that even if the errors in her trial do not individually require reversal, the cumulative effect of the errors rendered her trial fundamentally unfair. Only one error has been identified, which was the Commonwealth's Attorney's questioning of Detective Priddy. Because that error did not require reversal, and we found no other errors to aggregate with it, we need not engage in cumulative error analysis. *See Peacher v. Commonwealth,* 391 S.W.3d 821, 852 (Ky. 2013).

**CONCLUSION**

For the foregoing reasons, we affirm the judgment and sentence of the Hardin Circuit Court.

All sitting. All concur.

---

competency hearing even though the request was supported by one of the doctors who examined the defendant previously).

22

COUNSEL FOR APPELLANT:

Jared Travis Bewley
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Aspen Caroline Carlisle Roberts
Assistant Attorney General